[No. B172699. Second Dist., Div. Two. Mar. 21, 2006.]

CEDARS-SINAI MEDICAL CENTER, Plaintiff and Appellant, v.
SANDRA SHEWRY, as Director, etc., et al., Defendants and Respondents.

COUNSEL

Sonnenschein, Nath & Rosenthal, David L. Volk; Susan M. Walker; Greines, Martin, Stein & Richland, Robin Meadow, Cynthia Tobisman and Tillman J. Breckenridge for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Thomas Yanger, Assistant Attorney General, John H. Sanders and Karen L. Fried, Deputy Attorneys General, for Defendants and Respondents.

OPINION

DOI TODD, Acting P. J.—

### INTRODUCTION

In 1983, the state contracted with the University of California, Los Angeles Medical Center (UCLA) that UCLA be the sole provider of medical services to Medi-Cal beneficiaries in Los Angeles. With the state's approval, UCLA subsequently delegated to Cedars-Sinai Medical Center (Cedars-Sinai) the right to provide inpatient services to certain Medi-Cal beneficiaries and to bill

the state for those services under UCLA's contract rate. The delegation contract was later amended to expand the services Cedars-Sinai could provide. For the next four years, instead of billing the state under UCLA's contract rate, Cedars-Sinai billed and was paid under a higher cost rate for certain patients. Later the state's audits concluded that Cedars-Sinai should have been paid UCLA's contract rate for treatment of these patients, and the state recouped more than $35 million in overpayments.

Cedars-Sinai filed administrative appeals of the audit findings, but contended that under Welfare and Institutions Code section 14087.27 it was first entitled to judicial review of the terms of the contracts at issue. The administrative law judge disagreed, proceeded with the hearings, and denied the appeals.

Cedars-Sinai then filed a petition for writ of mandate against the director of the California Department of Health Services and the department itself (collectively the Department). The trial court affirmed the administrative findings, but reduced the recouped amount by the statutory penalty of 10 percent under Welfare and Institutions Code section 14171, subdivision (d). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Medi-Cal Reimbursement Program*

California's Medi-Cal program implements the federal Medicaid program, which funds medical services for elderly and low-income persons. (42 U.S.C. § 1396 et seq.; Welf. & Inst. Code, § 14000.) The Department administers the Medi-Cal program and reimburses hospitals for treating eligible Medi-Cal patients. (Welf. & Inst. Code, § 10721; Cal. Code Regs., tit. 22, § 50004.) The original federal Medicaid Act required states to reimburse hospitals for their "reasonable cost" of treating Medi-Cal patients, which included "the cost of services *actually* incurred by a hospital provider and otherwise allowable under Medicare." (*Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 751 [55 Cal.Rptr.2d 107, 919 P.2d 721].) In the early 1980's, Congress limited the reimbursement to "the costs that would have been incurred by an efficient and economically operated facility, even if a provider's actual costs were greater." (*Id.* at p. 752; see Cal. Code Regs., tit. 22, § 51536.)

In 1982, the California Legislature moved away from a pure cost-rate system and established a program by which the Department could contract with individual hospitals for the exclusive right to treat Medi-Cal patients.

(Welf. & Inst. Code, § 14081.) The California Medical Assistance Commission (CMAC), acting on behalf of the Department, drafted a master contract and negotiated directly with hospitals or held competitive bidding. (See Welf. & Inst. Code, §§ 14082, 14082.5, 14083.) To maintain consistency in administration of the Medi-Cal program, CMAC took the position that material deviations from the master contract would be allowed only in the areas of contractual rates and identified services to be provided by a specific hospital. A hospital awarded a "selective provider contract" is reimbursed by the Department at the negotiated contract rate, which is often a per diem rate. (Welf. & Inst. Code, §§ 14082, 14084.) After the Department contracts with a sufficient number of hospitals to meet the needs of Medi-Cal beneficiaries in a geographic area, it declares the area "closed" and awards no further contracts. (Welf. & Inst. Code, § 14081.)

With limited exceptions, noncontract hospitals in a closed area are generally not entitled to reimbursement for treating Medi-Cal patients. These exceptions include: (1) providing emergency care to a Medi-Cal patient, so long as the patient is transferred to a contract hospital once stabilized (Welf. & Inst. Code, §§ 14087, 14103.5); (2) providing services to a patient whose eligibility for Medi-Cal was unknown at the time of admission (retro-qualified patients) (Cal. Code Regs., tit. 22, §§ 50197, 51003, subd. (b), 51327, subd. (c)(3)(F)); and (3) providing services to a patient receiving prior authorization from California Children's Services (CCS patients) (Cal. Code Regs., tit. 22, § 51013; Health & Saf. Code, § 123800 et seq.). Noncontract hospitals treating Medi-Cal patients pursuant to one of the exceptions are paid a cost rate, which is generally higher than a contract rate. (Cal. Code Regs., tit. 22, § 51546.)

Noncontract hospitals submit annual reports of their actual Medi-Cal costs, which the Department uses to generate a tentative settlement statement. (*Robert F. Kennedy Medical Center v. Belshé, supra*, 13 Cal.4th at p. 753; *Fountain Valley Regional Hospital & Medical Center v. Bontá* (1999) 75 Cal.App.4th 316, 320 [89 Cal.Rptr.2d 139].) The Department then has three years in which to conduct an audit, after which it issues a final audit report and settlement which determines the hospital's allowable Medi-Cal costs for services to Medi-Cal patients for the pertinent fiscal year. (Welf. & Inst. Code, § 14170 et seq.; *Fountain Valley Regional Hospital & Medical Center v. Bontá, supra*, at p. 320.) Contract hospitals also file costs reports and are subject to audit by the Department, but such audits focus primarily on the number of days of care rendered, as opposed to complex cost reporting issues.

*The Prime Contract*

In 1983, the state awarded UCLA a selective provider contract to render inpatient hospital services to "any eligible beneficiary" (the prime contract). The prime contract defined "beneficiary" to include not only a patient who was eligible for Medi-Cal at the time of admission, but also persons whose eligibility was not determined until after inpatient services were rendered, i.e., retro-qualified patients.[1] The definition of "beneficiary" was standard language in the selective provider contracts and was not negotiable. The prime contract provided that UCLA would receive a specified per diem rate for treating Medi-Cal patients. No other hospital in Los Angeles was awarded a selective provider contract. As a result of the prime contract, UCLA became a full-service Medi-Cal provider, and Los Angeles was declared a closed area.

*The Delegation Contract*

As a noncontract hospital in a closed area, Cedars-Sinai could not receive reimbursement for Medi-Cal patients treated at its outpatient Ambulatory Care Clinic (ACC) who were later admitted for inpatient treatment. Cedars-Sinai was forced to turn away large numbers of Medi-Cal patients seeking outpatient treatment at the ACC. Not only did this negatively impact the patients, it also negatively impacted a Cedars-Sinai teaching program. As a teaching affiliate of UCLA, Cedars-Sinai allowed UCLA medical students to serve as clinical clerks at the ACC and to rotate through Cedars-Sinai's patient specialties to provide continuity of care to the ACC patients later admitted to Cedars-Sinai.

With the approval of the Department, UCLA and Cedars-Sinai entered into a delegation contract which allowed Cedars-Sinai to receive Medi-Cal reim-

---

[1] "Beneficiary" is defined in full in the prime contract as follows: " 'Beneficiary' means a person certified, pursuant to Sections 14016 and 14018 of the Welfare and Institutions Code, as eligible for Medi-Cal, except that beneficiary shall not include Medi-Cal beneficiaries enrolled in Prepaid Health Plans or other organized health systems which contract with the Department under the provisions of Sections 14000 et seq. of the Welfare and Institutions Code, and the regulations and definitions adopted under Title 22 of the California Administrative Code. *A beneficiary also includes that person whose eligibility was not determined until after the rendition of inpatient services.* Medi-Cal beneficiaries who are also eligible for Medicare hospital benefits under the provisions of Title XVIII of the Social Security Act, and who have not exhausted those benefits, are not considered beneficiaries within the meaning of this Contract. Beneficiary does not include those individuals receiving skilled nursing facility or long term care services or acute administrative day care." (Italics added.)

bursement for treatment of the ACC patients under UCLA's prime contract. The delegation contract became effective August 10, 1984, and was the first of its kind in the state.[2]

The delegation contract provided: "[Cedars-Sinai] shall provide acute inpatient care to patients who are registered in the [Cedars-Sinai] Ambulatory Care Center (Clinic) and determined to require inpatient care in areas of medicine, surgery, obstetrics/gynecology, pediatrics, neonatology (intensive care and intermediate neonatal nursery services) and nursery on behalf of UCLA, and shall receive payment from UCLA pursuant to this agreement only when such patients are prior authorized in writing (Treatment Authorization Request) or by telephone (log number) by the Department of Health Services on admission of the patient to [Cedars-Sinai]." The delegation contract provided that Cedars-Sinai would be paid the same per diem rate that UCLA received under the prime contract.

The parties agreed that the delegation contract was to be "governed by and construed in accordance with all applicable laws, regulations and provisions of the [prime] contract, and obligations of UCLA under the [prime] contract." The delegation contract provided that either party could terminate the contract "without cause at any time by giving written notice to the other party. . . . no later than 60 days prior to the effective date of termination."

Cedars-Sinai and UCLA operated under the delegation contract for eight years. Although the delegation contract required Cedars-Sinai to bill UCLA for reimbursement of inpatient treatment of prior authorized ACC Medi-Cal patients, Cedars-Sinai apparently billed the Department directly under UCLA's contract provider number and received UCLA's contract rate. The Department continued to pay Cedars-Sinai at the cost rate for its treatment of emergency room, retro-qualified and CCS patients.

### The Delegation Amendment

By 1992, UCLA needed relief from its increased Medi-Cal patient load and Cedars-Sinai needed relief from the administrative burden of having to transfer stabilized patients. In response, the CMAC drafted Amendment No. 1 to the delegation contract. UCLA, Cedars-Sinai and the Department signed the amendment, which became effective May 13, 1992 (delegation amendment).

---

[2] Cedars-Sinai claims the CMAC drafted the delegation contract. But we observe that in the administrative proceedings, Cedars-Sinai presented the declaration of James Foley, the CMAC negotiator for the prime contract and the delegation contract, who stated: "The Delegation Contract was drafted by UCLA on behalf of the State. [Cedars-Sinai] was not allowed to change any of the specific provisions."

The delegation amendment recited that it was negotiated "in order to expand the services provided under the Contract of Delegation to meet the needs of Medi-Cal beneficiaries located within the geographic area served by [Cedars-Sinai]." The delegation amendment provided: "The following services which are also available at UCLA may also be performed at [Cedars-Sinai] pursuant to the terms of the Contract of Delegation and this Amendment No. 1 and shall include: [¶] a. obstetrical services [¶] b. neonatal intensive care services [¶] c. pediatric services [¶] d. pediatric intensive care services [¶] e. services to Medi-Cal beneficiaries in [Cedars-Sinai's] AIDS Program [¶] f. services to Medi-Cal beneficiaries admitted through [Cedars-Sinai's] emergency department [¶] g. major organ transplant services . . . ."

The delegation amendment further provided that UCLA and Cedars-Sinai "covenant that the Contract of Delegation and this Amendment No. 1 shall be governed by and construed in accordance with all applicable laws and regulations and UCLA's obligations under [the prime contract] and all Amendments thereto," and that "[a]ll other terms and provisions of the Contract of Delegation shall remain in full force and effect except as expressly modified . . . ."

The delegation amendment remained in effect from 1992 to 1996. In 1996, the Department awarded Cedars-Sinai its own selective provider contract and Cedars-Sinai became a full-service Medi-Cal provider.

*The Audits*

In April 1995, the Department conducted its first audit of Cedars-Sinai's performance under the delegation amendment. The audit covered Cedars-Sinai's 1993 fiscal period from April 1, 1992, to March 31, 1993, and included 10 months of performance under the delegation amendment. Cedars-Sinai was identified as a noncontract Medi-Cal provider and the Department approved cost-rate reimbursement for Cedars-Sinai's treatment of retro-qualified and CCS patients.

In 1996, the Department conducted an audit covering Cedars-Sinai's performance during its 1994 fiscal period and determined that Cedars-Sinai was entitled to contract-rate reimbursement for treating retro-qualified and CCS patients rather than the cost-rate approved in the previous audit. The Department took the position that by signing the delegation amendment, Cedars-Sinai had become a "de facto" contract hospital entitled to receive the same rate that UCLA received for treating retro-qualified and CCS patients. The Department then reopened the 1993 fiscal-period audit and adjusted its findings consistent with its position. The Department took the same position

in its subsequent audits of the 1995 through 1997 fiscal periods.[3] The Department concluded that by paying at the cost rate it had overpaid Cedars-Sinai approximately $35 million. This amount was the difference between the contract rate and the cost-rate reimbursements Cedars-Sinai had claimed in its cost reports.

### The Administrative Proceedings

Cedars-Sinai filed administrative appeals from each of the Department's audit findings. It initially contended that the Department's Office of Administrative Appeals lacked jurisdiction to interpret the terms of the contracts at issue, and argued that Cedars-Sinai was entitled to judicial interpretation in the first instance under Welfare and Institutions Code section 14087.27, subdivision (a). The Administrative Law Judge (ALJ) disagreed, and administrative hearings were held on May 6 to 7, 1998.

The ALJ ordered the parties to submit posthearing briefs by August 28, 1998, and rebuttal briefs by September 15, 1998. The parties submitted their final briefs on September 15, 1998. On July 15, 1999—303 days later—the ALJ issued his proposed decision, announcing for the first time that the record had been closed on October 1, 1998. The ALJ denied the appeals and upheld the audits, making the following findings: the definition of Medi-Cal beneficiary in the prime contract was incorporated into the delegation contract and the delegation amendment; the language in the prime contract stating that a beneficiary included a retro-qualified patient was clear and unambiguous; because UCLA was paid the contract rate for treating retro-qualified patients, Cedars-Sinai should be paid the same rate for treating the same patients; and there was no mutual mistake. On July 23, 1999, the Department adopted the proposed decision as its final decision.

### The Trial Court Proceedings

Cedars-Sinai filed a petition for writ of mandate and a complaint against the Department for declaratory relief, breach of contract and reformation. Three years later, prior to any proceedings on the writ petition or complaint, Cedars-Sinai filed a motion for trial de novo, arguing that the administrative

---

[3] To summarize, for the fiscal year ending March 31, 1993, the Department issued its original audit report on April 28, 1995. For the fiscal year ending March 31, 1994, the Department issued its audit report on May 1, 1996. The Department then reopened the 1993 fiscal year audit and issued its revised report on August 23, 1996. For the fiscal year ending March 31, 1995, the Department issued its audit report on March 31, 1997. For the fiscal year ending June 30, 1995, the Department issued its audit report on March 31, 1997. For the fiscal period ending June 30, 1996, the Department issued its audit report on April 10, 1998. And for the fiscal period ending June 30, 1997, the Department issued its audit report on April 15, 1999.

tribunal lacked jurisdiction to interpret the terms of the contracts under Welfare and Institutions Code section 14087.27, subdivision (a) and that Cedars-Sinai was entitled to judicial review under Code of Civil Procedure section 1085 without regard to the administrative record. The trial court denied the motion, finding that subdivision (a) of Welfare and Institutions Code section 14087.27 was not applicable, and stated that it would proceed under Code of Civil Procedure section 1094.5 based on the administrative record. Cedars-Sinai then filed a memorandum of points and authorities in support of its petition for writ of mandate, which the Department opposed.

In ruling on the petition for writ of mandate, the trial court stated that because "the facts here are not in dispute, this matter presents only questions of law, which are reviewed de novo." The trial court denied the writ petition to the extent it challenged the ALJ's finding that the Department was entitled to recoup its overpayment. Specifically, the trial court agreed with the ALJ that the prime contract's definition of "beneficiary" was unambiguous and that it was incorporated into the delegation contract and the delegation amendment. The trial court also concluded that there was no mutual mistake and that the Department's recoupment was not barred by laches or estoppel because its audits were timely performed. However, the trial court granted the petition to the extent it challenged the amount of the recoupment, finding that the Department's adoption of the ALJ's proposed decision was untimely, and ordered the recouped amount to be decreased by the statutory penalty of 10 percent. In light of its ruling, the court dismissed Cedars-Sinai's causes of action for declaratory relief, breach of contract and reformation and entered judgment accordingly. Cedars-Sinai appeals the judgment. In a cross-appeal, the Department challenges the trial court's imposition of the statutory penalty.

## DISCUSSION

### I. *Contentions on Appeal*

Cedars-Sinai contends that (1) It was entitled to judicial review of the contracts at issue under Welfare and Institutions Code section 14087.27, subdivision (a) prior to any administrative hearings; (2) the definition of Medi-Cal "beneficiary" in the prime contract was not incorporated into the delegation amendment and the definition was ambiguous; (3) the delegation amendment should be reformed; and (4) the doctrines of laches and estoppel bar the Department's recoupment.

In its cross-appeal, the Department contends that the recouped amount should not have been reduced under Welfare and Institutions Code section 14171, subdivision (d) because the Department timely adopted the ALJ's proposed decision.

II. *Standard of Review*

Because pure questions of law were decided by the trial court upon undisputed facts in this mandamus proceeding, a de novo standard will apply on appeal. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109 [61 Cal.Rptr.2d 134, 931 P.2d 312]; *Sierra Vista Regional Medical Center v. Bontá* (2003) 107 Cal.App.4th 237, 245 [132 Cal.Rptr.2d 9]; *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219 [79 Cal.Rptr.2d 910].) This standard is applicable to each of the issues presented here. (See, e.g., *Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 348 [94 Cal.Rptr.2d 287] [statutory interpretation]; *Sierra Vista Regional Medical Center v. Bontá, supra,* at p. 245 [contract interpretation].) While issues pertaining to the intention of the parties to a contract and laches and estoppel are ordinarily questions of fact, a de novo standard applies where the facts are undisputed. (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 [6 Cal.Rptr.2d 554]; *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

III. *Judicial Review of Contract Terms Is Not Available for Recoupment Efforts Based on an Audit*

Welfare and Institutions Code section 14087.27 provides in relevant part:

"(a) Notwithstanding any other provision of law, judicial review pursuant to Section 1085 of the Code of Civil Procedure, shall be available to resolve disputes relating to the terms, performance, or termination of contracts entered into pursuant to this article, or any act, failure to act, conduct, order, or decision of the special hospital negotiator or the commission which violate the provisions of this article.

"(b) Subdivision (a) shall not apply to recoupment efforts based on an audit or review of hospital performance of the terms and conditions of the negotiated contract. These recoupment efforts shall be reviewable pursuant to Section 14171."[4]

---

[4] Welfare & Institutions Code section 14171, subdivision (a) provides that "[t]he director shall establish administrative appeal processes to review grievances or complaints arising from the findings of an audit or examination made pursuant to Sections 10722 and 14170 . . . ." Subdivision (j) provides: "The final decision of the director shall be reviewable in accordance with Section 1094.5 of the Code of Civil Procedure within six months of the issuance of the director's final decision."

According to the legislative history of a 1997 amendment to section 14171, one purpose of the legislation was to confirm the Department's authority to have its own ALJ's (rather than ALJ's from the Office of Administrative Hearings) hear administrative appeals. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 68 (1997–1998 Reg. Sess.) July 11, 1997, p. 1; Assem. Com. on Judiciary, Rep. on Sen. Bill No. 68 (1997–1998 Reg. Sess.) June 11,

■ "In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] 'We begin by examining the statutory language, giving the words their usual and ordinary meaning.' [Citation.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.]" (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911 [108 Cal.Rptr.2d 165, 24 P.3d 1191].) "An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) At all times, "[o]ur foremost task remains ascertainment of the legislative intent, including consideration of 'the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (*City of Long Beach v. California Citizens for Neighborhood Empowerment* (2003) 111 Cal.App.4th 302, 306 [3 Cal.Rptr.3d 473].)

The trial court found that "the plain language of subdivision (b) is that the subdivision (a) only applies where there are no recoupment efforts based on an audit." Cedars-Sinai contends this finding was error. It argues that in order for an auditor to determine whether a hospital is " 'perform[ing] . . . the terms and conditions' of a contract, the auditor *must already know* what those terms and conditions are," and that any interpretational dispute must have already been resolved. Cedars-Sinai points out that no statutes or regulations grant auditors the power to interpret contracts.[5]

■ While there is some logic to Cedars-Sinai's argument, we agree with the trial court that the plain language of subdivision (b) of Welfare and Institutions Code section 14087.27 provides that judicial review is not available for recoupment efforts based on an audit of hospital performance of the terms and conditions of the negotiated contract. Subdivision (b) makes clear that such recoupment efforts must be reviewed administratively prior to any judicial review. The statutory language is unambiguous in this regard.

1997, p. 3; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 68 (1997–1998 Reg. Sess.) Apr. 16, 1997, p. 1.) In the absence of a statutory exemption, California administrative agencies must use ALJ's from the Office of Administrative Hearings. (Gov. Code, § 11502, subd. (a).)

[5] (See Welf. & Inst. Code, § 14170, subd. (a) (1) [the department may conduct audits of "[a]mounts paid for services provided to Medi-Cal beneficiaries . . . in the manner and form prescribed by the department"]; Welf. & Inst. Code, § 14087.1 [the department is authorized to audit "performance under any [selective provider] contract" and may evaluate the "[l]evel and quality of care, and the necessity and appropriateness of the services provided," "[i]nternal procedures for assuring efficiency, economy and quality of care," "[g]rievances relating to medical care and their disposition," and "[f]inancial records only when determined necessary by the department to protect public funds"].)

Cedars-Sinai further argues that because every audit examines the "performance of the terms and conditions of the [negotiated] contract," the Department could always avoid judicial review of contractual terms by simply waiting to raise them during an audit, in which case the exception in subdivision (b) would swallow the rule in subdivision (a). We do not agree because it is clear that the Department cannot control when such an issue is raised. A dispute over contractual terms can arise prior to or outside the context of recoupment efforts based on an audit. Indeed, here, the evidence shows that Cedars-Sinai inquired of the Department how to bill Medi-Cal claims under the delegation amendment, but did not receive any guidance.[6] Cedars-Sinai could have pursued the matter further, including filing an action in superior court for declaratory relief. It did not do so and elected to bill at the cost rate for retro-qualified and CCS patients under the delegation amendment.

Our conclusion that judicial review is not available for recoupment efforts based on an audit comports with "the entire scheme of law" of which section 14087.27 is part. For the Medi-Cal program to run smoothly and efficiently, there must be consistency in administration. Recoupment efforts can involve complex accounting procedures that the Department's administrative tribunal is better suited to address than a court. Additionally, recoupment efforts often take place years after performance under the contract at issue has been completed and can, as in this case, involve many years of performance. It is therefore reasonable that recoupment efforts, which are based on an audit or review of hospital performance of the terms and conditions of a negotiated Medi-Cal contract, be reviewed in the first instance by the agency charged with administration of the Medi-Cal program. But if there is a dispute between the parties as to terms of the contract involving ongoing or prospective performance outside of the recoupment process, judicial review is immediately available.[7]

We therefore conclude that Cedars-Sinai was not entitled to judicial review in the first instance and that the administrative tribunal had jurisdiction to interpret the contracts at issue.

---

[6] Ira Alexander, the assistant director of patient accounting at Cedars-Sinai, testified: "We tried to inquire to the State on how to bill the claims to Medi-Cal, but the State was not familiar with the contract itself."

[7] In its reply brief, Cedars-Sinai cites for the first time to *De Guere v. Universal City Studios, Inc.* (1997) 56 Cal.App.4th 482, 501 [65 Cal.Rptr.2d 438], which stated that "[i]ssues of contract interpretation are questions of law for the trial court . . . ." Ordinarily we give no consideration to arguments and authority raised for the first time in a reply brief. But even if we were to consider the authority, it is inapposite. That case dealt with the scope of a special referee's authority under Code of Civil Procedure section 639, which authorizes a reference for the examination of a long account, and not with administrative hearings.

## IV. *Cedars-Sinai Is Limited to Contract-rate Payment for Retro-qualified and CCS Patients*

The primary dispute here is whether Cedars-Sinai is limited to contract-rate payment for its treatment of retro-qualified and CCS patients under the delegation amendment, pursuant to which Cedars-Sinai was authorized to perform services for "Medi-Cal beneficiaries" admitted through its emergency room and AIDS program.[8] Both the ALJ and the trial court concluded that Cedars-Sinai was limited to contract-rate payment, finding that the definition of "beneficiary" in the prime contract was incorporated into the delegation amendment and that the definition unambiguously included retro-qualified patients. In reaching this conclusion, the trial court did not consider extrinsic evidence. Cedars-Sinai contends this ruling is erroneous for two reasons: (1) The prime contract's definition of "beneficiary" was not incorporated into the delegation amendment, and (2) the prime contract and the delegation amendment are "replete" with irreconcilable ambiguities.

### A. *Principles of Contract Interpretation*

▮ Because resolution of this dispute involves contract interpretation, we begin by reviewing the controlling principles of contract interpretation. "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. (Civ. Code, § 1636; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. (Civ. Code, § 1639.)" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [135 Cal.Rptr.2d 505]) (*Founding Members*). "The words of a contract are to be understood in their ordinary and popular sense . . . ." (Civ. Code, § 1644.)

▮ "When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the

---

[8] To clarify, there is no dispute that the original delegation contract did not limit Cedars-Sinai to contract-rate reimbursement for retro-qualified and CCS patients, since that agreement expressly provided that Cedars-Sinai would be reimbursed for providing inpatient care to Medi-Cal patients registered in the ACC "only when such patients are prior authorized in writing." As the Department states on appeal, "retro-qualified beneficiaries would not have been covered under the Delegation Agreement, . . . because the Medi-Cal prior authorization requirement of the Delegation Agreement would not have been met for these persons." This appeal does not involve any recoupment by the Department of monies paid at the cost rate for retro-qualified or CCS patients under the delegation contract.

parties intend the language to mean?" (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 847 [44 Cal.Rptr.2d 227]; see *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487].) Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent. (*Southern Cal. Edison Co. v. Superior Court, supra,* at p. 848.) Extrinsic evidence can include the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. (Civ. Code, § 1647; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].) When no extrinsic evidence is introduced or the extrinsic evidence was not relied on by the trial court or is not in conflict, we independently construe the contract. (*Founding Members, supra,* 109 Cal.App.4th at p. 955.)

█ "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.' " (*Founding Members, supra,* 109 Cal.App.4th at p. 956.) "The parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Ibid.*)

### B. The Delegation Amendment Incorporated the Prime Contract's Definition of "Beneficiary"

Cedars-Sinai admits that the prime contract's definition of "beneficiary" includes retro-qualified patients, but claims that the delegation amendment does not incorporate this definition. It points out that while the original delegation contract provided that it was to be "governed by and construed in accordance with all applicable laws, regulations and provisions of the [prime] contract," the delegation amendment omits any reference to "provisions" of the prime contract. According to Cedars-Sinai, such omission can only mean that the prime contract's provisions were not incorporated into the delegation amendment and that the prime contract's definition of "beneficiary" no longer controls. We disagree.

The delegation amendment provides in paragraph 2 that it "shall be governed by and construed in accordance with all applicable laws and regulations and UCLA's obligations under [the prime contract]." One of UCLA's obligations under the prime contract at paragraph 3.1 was to render specified inpatient services to "any eligible beneficiary," including retro-qualified beneficiaries, and to accept a specified contract rate as payment for such services. Paragraph 4 of the delegation amendment further provides: "All other terms and provisions of the Contract of Delegation shall

remain in full force and effect except as expressly modified by this Amendment No. 1 to Contract of Delegation . . . ." The delegation amendment did not expressly modify the definition of "beneficiary." Nor did the original delegation contract modify the definition of "beneficiary," since that agreement only authorized Cedars-Sinai to treat and be paid for a limited category of Medi-Cal patients, i.e., prior authorized ACC patients. The definition of Medi-Cal "beneficiary" otherwise remained unchanged. Thus, construing together paragraphs 2 and 4 of the delegation amendment, we conclude that the original definition of "beneficiary" in the prime contract was incorporated into the delegation amendment.

## C. The Contracts Are Not Ambiguous

Cedars-Sinai argues that even if the delegation amendment does include the prime contract's definition of "beneficiary," "its inclusion was at best ambiguous, so the contract must be construed against the Department." Cedars-Sinai claims that both contract language and extrinsic evidence support its interpretation that the delegation amendment excludes retro-qualified and CCS patients.

To support its position, Cedars-Sinai points out that the prime contract does not employ the term "beneficiary" consistently. For example, while the definition of "beneficiary" includes retro-qualified patients, the prime contract obligated UCLA to provide a written questionnaire to the beneficiary "at the time of the beneficiary's admission" and to provide certain grievance procedures to Medi-Cal beneficiaries. Cedars-Sinai asserts that a hospital will not be able to comply with these requirements when the patient is retro-qualified because most such patients will have been discharged before their Medi-Cal eligibility is determined. According to Cedars-Sinai a literal reading of the contract language makes a single meaning of "beneficiary" impossible.

Again we disagree. While some of the obligations the prime contract imposed on a provider might not have consistently applied to all Medi-Cal beneficiaries, there is nothing in the express terms of the prime contract to suggest that a provider would not be paid the contract rate for treating retro-qualified beneficiaries.

Cedars-Sinai also relies on the declaration of James Foley, the CMAC director of negotiations who was involved in the early development of the master contract form for the selective provider contracts. Foley admitted that the "retro-qualified beneficiary language of paragraph 2.3 created unresolved inconsistencies when read in the context of other provisions of the Master Contract." But Cedars-Sinai ignores Foley's remaining testimony that "CMAC's negotiating position was that the language would not be changed

and that it simply authorized Medi-Cal payment to the contracting provider under circumstances in which the patient's Medi-Cal status was established only after admission." Additionally, CMAC's senior negotiator, James Ringrose, testified that while the definition of "beneficiary" "was a sticking point in the early negotiations . . . . [¶] . . . it became much less of a problem in the operation of the contract as people became used to it." There is no evidence that UCLA or the Department ever interpreted the prime contract to exclude retro-qualified Medi-Cal patients from contract-rate reimbursement.

Cedars-Sinai also argues that extrinsic evidence of the negotiations leading to the delegation contract highlight the contract's ambiguities. It relies again on Foley's declaration, in which he stated that during the delegation contract negotiations "there was no discussion of the definition of Medi-Cal beneficiary that is contained in paragraph 2.3 of the Prime Contract, or of the issue whether payment for retro-qualified Medi-Cal patients would be governed by the Delegation Agreement." But, as the Department points out, the delegation contract only covered a narrow category of patients—*prior authorized* ACC patients—which necessarily excluded retro-qualified patients. Because retro-qualified patients were not covered by the delegation contract, evidence of the lack of any discussion of such patients is irrelevant.

Cedars-Sinai also relies on evidence of the lack of any discussion of retro-qualified patients during negotiations of the delegation amendment. It cites to the declaration of Joseph Luevanos, who negotiated the delegation amendment on behalf of Cedars-Sinai, in which he stated that he had no recollection of any discussion of retro-qualified patients during the negotiations. He further stated that had there been such discussions, it would have been Cedars-Sinai's position that such patients were not part of the delegation amendment since Cedars-Sinai was already entitled to cost-rate reimbursement for these patients. But a party's undisclosed statements regarding intent or understanding of a contract are irrelevant to contract interpretation under the objective theory of contracts. (*Founding Members, supra,* 109 Cal.App.4th at p. 960.)

Cedars-Sinai also relies on the testimony of CMAC negotiator Ringrose, who confirmed that there were no discussions of retro-qualified patients during the delegation amendment negotiations. But, again, it fails to cite to the remainder of his testimony that if the subject of retro-qualified patients had been raised, "I don't know what [the Department's] position would have been had it come up." Thus, the absence of any discussion of retro-qualified patients during the negotiations does not convince us that the use of the term "Medi-Cal beneficiaries" in the delegation amendment is reasonably susceptible of the interpretation urged by Cedars-Sinai. (See *Oakland-Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.* (1988) 197 Cal.App.3d 1049,

1058 [243 Cal.Rptr. 300] [unexpressed intentions during negotiations cannot be used to interpret a contract].)

Cedars-Sinai also claims that its course of conduct under the delegation amendment supports its interpretation. A party's conduct subsequent to the formation of a contract may be looked upon to determine the meaning of disputed contractual terms. (*Oceanside 84, Ltd. v. Fidelity Federal Bank, supra,* 56 Cal.App.4th at p. 1449 ["[T]he conduct of the parties after the execution of the contract, and before any controversy arose, may be considered in order to attempt to ascertain the parties' intention"]; *Southern Cal. Edison Co. v. Superior Court, supra,* 37 Cal.App.4th at p. 851.) According to Witkin, "The conduct of the parties may be, in effect, a *practical construction* thereof, for they are probably least likely to be mistaken as to the intent." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 749, p. 838.)

Cedars-Sinai points out that for the four years it operated under the delegation amendment, it continued to request and receive cost-rate payments from the Department for treating retro-qualified and CCS patients. Cedars-Sinai made these requests by submitting a treatment authorization request (TAR) or retro-TAR to a Medi-Cal field office. For retro-qualified and CCS patients, Cedars-Sinai identified its noncontract hospital provider number and not UCLA's contract provider number. But Sylvester Davis, administrator of the Los Angeles Medi-Cal field office, testified that when his office received a TAR, "[b]asically, the only issue we're concerned with is whether it's medically indicated and the administrative requirements are met." Davis further testified that a TAR authorization is not a guarantee of payment, that a disclaimer to that effect appears on the TAR, and that any payment made is subject to later audit by the Department. The Department's audit supervisor, Robert Gennuso, testified to the same effect. There was also no evidence that the Medi-Cal field office was aware of the delegation amendment at the time it was approving the TAR's or retro-TAR's in question. Nor was there any evidence that the fiscal intermediary actually handling the payments made any determination as to the correct provider number. Thus, routine approval of TAR's and retro-TAR's submitted by Cedars-Sinai under its noncontract provider number, and ongoing payment to Cedars-Sinai under the identified noncontract number, do not support Cedars-Sinai's argument that the parties shared the same intent.

Cedars-Sinai also relies on the Department's first audit of its performance under the delegation amendment. This audit was conducted in 1995 and reviewed Cedars-Sinai's fiscal period ending in March 1993, which included the first 10 months of performance under the delegation amendment. Because that audit approved cost-rate reimbursement for retro-qualified and CCS

patients, Cedars-Sinai argues that it "is hard to imagine a more unequivocal endorsement of Cedars-Sinai's interpretation of the amended delegation contract."

We disagree for two reasons. First, there is no evidence in the record that the audit department was aware of the delegation amendment at the time it conducted the audit covering the 1993 fiscal period. Second, even if there had been such evidence, the Department did not continue to approve cost-rate reimbursement for retro-qualified and CCS patients in each of its next audits. In its second audit of Cedars-Sinai's performance under the delegation amendment (the 1996 audit), which covered Cedars-Sinai's fiscal period ending in March 1994, the Department determined that under the delegation amendment Cedars-Sinai was only entitled to receive the same contract-rate reimbursement UCLA received for treating retro-qualified and CCS patients. The Department then reopened its first audit and made adjustments for the overpayment. In each of its subsequent audits, the Department continued to approve only contract-rate reimbursement for retro-qualified and CCS patients. Once again, we are not persuaded that evidence of the parties' performance supports Cedars-Sinai's position.

We conclude that neither the language in any of the three contracts at issue nor the extrinsic evidence supports Cedars-Sinai's interpretation of the term "beneficiary" in the delegation amendment. The prime contract's definition of "Medi-Cal beneficiary" unambiguously included retro-qualified patients. Because this definition remained unchanged and was incorporated into the delegation amendment, Cedars-Sinai was limited to the contract rate for its treatment of retro-qualified patients. All of Cedars-Sinai's rights and duties under the delegation contract and the delegation amendment flowed from UCLA's rights and duties under the prime contract. In essence, Cedars-Sinai is arguing that while UCLA was obligated to receive contract-rate payment for treating a retro-qualified or CCS patient, Cedars-Sinai was nevertheless entitled to receive a higher noncontract rate for providing the very same service for the very same patient. The contract language is not reasonably susceptible of the interpretation urged.

## V. There Is No Basis for Reformation

Cedars-Sinai argues that if the prime contract's definition of "beneficiary" is applicable to the delegation amendment, it fails to reflect the parties' intentions and the delegation amendment must therefore be reformed.

■ A written contract may be reformed when, through "a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected," the contract fails to express the intention of the parties. (Civ. Code, § 3399.) A court may consider extrinsic evidence in determining whether a mutual mistake has occurred. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 525 [117 Cal.Rptr.2d 220, 41 P.3d 46]; Civ. Code, § 3401.) We have already concluded that the extrinsic evidence presented here does not support the parties' *mutual* intention that the term "beneficiary" excluded retro-qualified and CCS patients.

■ Nor is Cedars-Sinai entitled to reformation of the delegation amendment on the basis of a unilateral mistake. Reformation for unilateral mistake is not available unless the mistake of one party was known or suspected by the other party at the time of the execution of the document. (*City of Cypress v. New Amsterdam Cas. Co.* (1968) 259 Cal.App.2d 219, 225 [66 Cal.Rptr. 357].) There is no evidence that the Department knew or suspected that Cedars-Sinai intended the delegation amendment to exclude retro-qualified or CCS patients at the time the parties entered into the delegation amendment, since these topics were never discussed during the negotiations and Cedars-Sinai never expressed its intention. Indeed, Ringrose testified that had the issue come up, he was not sure how the Department would have responded. Thus, there is no merit to Cedars-Sinai's claim for reformation.

### VI. *There Is No Basis for Applying Laches or Estoppel*

Cedars-Sinai argues that the doctrines of laches and estoppel bar the Department's recoupment. The trial court rejected these arguments, finding that the audits were timely performed under the terms of the prime contract and "[t]he way the system is set up ensures that such review can only take place after the services have been rendered and reimbursed" so that "any delay here was not unreasonable."

■ "Laches is an equitable defense. It consists of a failure on the part of a plaintiff to assert his rights in a timely fashion accompanied by a period of delay with consequent results prejudicial to the defendant. . . ." (*Rouse v. Underwood* (1966) 242 Cal.App.2d 316, 323 [51 Cal.Rptr. 437].) "Delay is not a bar unless it works to the disadvantage or prejudice of other parties." (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 18, p. 304.) "Under appropriate circumstances, the defense of laches may operate as a bar to a claim by a public administrative agency, such as the Department, *if the*

*requirements of unreasonable delay and resulting prejudice are met."* (*Robert F. Kennedy Medical Center v. Belshé, supra,* 13 Cal.4th at p. 760, fn. 9, italics added.)

 We agree with the trial court that Cedars-Sinai failed to establish an unreasonable delay by the Department. Contrary to Cedars-Sinai's argument, the Department did not wait 12 years to assert its interpretation of the term "beneficiary." The parties' performance for eight years under the original delegation contract is not relevant here because that agreement by its terms excluded retro-qualified patients, and no party has ever asserted otherwise. With respect to the delegation amendment, the department's first real opportunity to review Cedars-Sinai's performance was during the audit process (and not through the TAR process as noted above), which takes place years after services have been rendered and reimbursed. For each of the audits at issue here, the Department conducted its audit two years after the end of the fiscal period that it was auditing, and in some cases less than two years. (See fn. 3, *ante.*) Welfare and Institutions Code section 14170, subdivision (a)(1) provides that a provider's cost reports and related data "shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later."[9] Cedars-Sinai has never claimed that these audits were untimely performed. And there is no evidence that the Department's auditors were aware of the delegation amendment at the time they conducted the first audit for the 1993 fiscal period. In connection with the next audit performed the following year, the Department reopened the 1993 audit and determined that it had overpaid Cedars-Sinai. Under these circumstances, we find no unreasonable delay.

Because we find no unreasonable delay, we need not reach the issue of prejudice. But were we to do so, we would find that Cedars-Sinai has failed to show prejudice. It simply claims that "[i]f the Department had disclosed its interpretation even as late as the 1993 fiscal-period audit in 1995, Cedars-Sinai would have had the option of immediately terminating the delegation contract, thereby avoiding some $7.8 million in recoupment for the 1996 and 1997 fiscal periods." But Cedars-Sinai presented no evidence that it would have done so.

---

[9] The trial court concluded that the Department had four years under the prime contract to conduct its audits, relying on paragraph 5.2(a), in which UCLA covenants that it will preserve and make available its records relating to payments for a period of four years from the close of its fiscal year. The delegation contract expressly imposed the same requirement on Cedars-Sinai at paragraph 20(e).

 We also find that the doctrine of equitable estoppel is inapplicable here. The doctrine of equitable estoppel " 'provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citations.]' " (*Killian v. City and County of San Francisco* (1978) 77 Cal.App.3d 1, 13–14 [143 Cal.Rptr. 430].) There is no basis for applying estoppel here because there is no evidence that the Department intentionally misled Cedars-Sinai to believe the delegation amendment did not cover retro-qualified and CCS patients. To argue otherwise, Cedars-Sinai simply points to the TAR's that were routinely approved by the Medi-Cal field offices and the Department's 1993 fiscal year audit. But such action does not demonstrate intentional conduct on the part of the Department to mislead Cedars-Sinai.

## VII. *The Recouped Amount Must Be Reduced by 10 Percent*

In its cross-appeal, the Department challenges that portion of the judgment reducing the recouped amount by 10 percent for the Department's failure to timely adopt the ALJ's proposed decision.

 Under Welfare and Institutions Code section 14171, subdivision (e)(3)(A), "a final decision in an institutional provider appeal shall be adopted within 300 days after the closure of the record of the impartial hearing." This time limitation is "mandatory." (Welf. & Inst. Code, § 14171, subd. (d).) If the Department fails to adopt a final decision within the 300-day deadline, "the amount of any overpayment which is ultimately determined by the department to be due shall be reduced by 10 percent for each 30-day period, or portion thereof, . . ." following the delay. (*Ibid.*)

As noted above, the ALJ ordered the parties to submit posthearing briefs by August 28, 1998, and rebuttal briefs by September 15, 1998. Both parties submitted their final briefs on September 15, 1998, and filed nothing further. The ALJ issued his proposed decision 303 days later on July 15, 1999, announcing for the first time that "[t]he record was closed on October 1, 1998." Eight days later on July 23, 1999, the Department adopted the ALJ's proposed decision as its final decision.

The ALJ provided no explanation for its statement that the record closed 16 days after the parties' final submission of their briefs. Without citation to any authority, the Department argues that "ALJs, like any other judge, surely retain some discretion to decide when to close the record" and that it was reasonable for the ALJ to hold the record open for two weeks "to review the final briefs and determine that no other material would be needed."

The trial court rejected the Department's argument, holding that September 15, 1998, constituted the "closing of the administrative record, in spite of the ALJ's statement that it closed 16 days later, because that was the last date on which material was admitted into the proceeding," and the Department's "final decision issued on July 23, 1999 was 11 days late." The trial court therefore ordered a 10 percent reduction in the Department's recoupment.

The question to be resolved here is what does "closure of the record" mean in this context? This phrase is not defined in the statute. As previously discussed, in construing a statute we must "accord words their usual, ordinary, and common sense meaning based on the language the Legislature used and the evident purpose for which the statute was adopted." (*In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789].) Cedars-Sinai points to dictionary definitions: "Closure" means "a bringing to an end," and "record" is "the commitment to writing, as authentic evidence, of something having legal importance, esp. as evidence of the proceedings or verdict of a court." (Random House Unabridged Dict. (2d ed. 1993) pp. 390, 1613.) Cedars-Sinai also points out that similar variations of these definitions appear in regulatory definitions of "administrative record," which generally include the presentation of written evidence and argument submitted to an adjudicatory body.[10]

---

[10] (See Cal. Code Regs., tit. 17, § 60055.2 [Air Resources Bd.: " 'Administrative Record' means all documents and records timely filed with the hearing office, pursuant to section 60055.4 and the time deadlines of these rules, including pleadings, petitions, motions, and legal arguments in support thereof; all documents or records admitted into evidence or administratively noticed by the hearing officer; all official recordings or written transcripts of hearings conducted; and all orders or decisions issued by the hearing officer or the state board regarding the petition for review of an executive officer decision; administrative record does not include any prohibited communications as defined in section 60055.13, and any settlement discussions or offers of settlement pursuant to section 60055.24"]; Cal. Code Regs., tit. 20, § 1702 [State Energy Resources Conservation and Development Com.: " 'Administrative Record' means all materials that have been entered into the docket on the proceeding"]; U.S. Tax Ct. rule 210(b)(12) [" 'Administrative record' includes, where applicable, the request for determination, all documents submitted to the Internal Revenue Service by the applicant in respect of the request for determination, all protests and related papers submitted to the Internal Revenue Service, all written correspondence between the Internal Revenue Service and the applicant in respect of the request for determination or such protests, all pertinent returns filed with the Internal Revenue Service, and the notice of determination by the Commissioner"]; cf. *Vega v. Nat. Life Ins. Services, Inc.* (5th Cir. 1999) 188 F.3d 287, 300 ["We hold today that the

 Cedars-Sinai further points out that administrative law in California and other jurisdictions generally defines "closure of the record" to mean bringing the written record to an end. For instance, under the Division of Workers' Compensation rules, a case is submitted upon "the closing of the record for the receipt of further evidence or argument" (Cal. Code Regs., tit. 8, § 9712), while hearing records before the Victim Compensation and Government Claims Board close "at the deadline for the submission of post-hearing briefs" (Cal. Code Regs., tit. 2, § 873.10).[11] Likewise the date of final submission of evidence and argument in the context of arbitration constitutes record closure.[12] We conclude that the plain meaning of "closure of the record" is the date of the parties' final submissions of written evidence or argument.

 But even if we were to find this phrase to be ambiguous, legislative history supports our construction. (*English v. IKON Business Solutions, Inc.* (2001) 94 Cal.App.4th 130, 142–143 [114 Cal.Rptr.2d 93] [courts may consult legislative history where statutory language ambiguous].) The Legislature enacted the 300-day deadline in 1988 because the administrative appeal process at the Department had become "unnecessarily lengthy and slow." (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 2424 (1987–1988 Reg. Sess.) Aug. 15, 1988, p. 2.) This resulted in "extended uncertainty to providers." (*Ibid.*) Accordingly, the Legislature established a

---

administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it"].)

[11] (See also Cal. Code Regs., tit. 7, § 237(i) [State Bd. of Pilot Commissioners for the Bays of S.F., San Pablo, and Suisun: "Following the presentation by the committee appointed pursuant to subsection (g) of this section, any additional presentations on behalf of the San Francisco Bar Pilots, the maritime industry and the general public, the Board shall close the record and proceed with deliberations . . . ."]; Cal. Code Regs., tit. 8, § 10301 [Dept. of Industrial Relations: " 'Submission' means the closing of the record to the receipt of further evidence or argument"]; Cal. Code Regs., tit. 16, § 974.2 [Bd. of Barbering and Cosmetology: "If the disciplinary review committee elects to hold the record open for submission of additional written information, the cited person must provide the additional written information to the same disciplinary review committee prior to its next scheduled meeting, and the committee shall close the record and consider the matter at its next scheduled meeting"].) (See also *Norfolk Southern Ry. v. Pennsylvania PUC* (Pa.Cmmw.Ct. 2005) 875 A.2d 1243, 1246–1247 [finding that the record closed after all parties offered exhibits, presented witnesses, and filed briefs]; *Louis Leustek & Sons, Inc. v. U.S.* (1998) 41 Fed.Cl. 657, 661 [finding that the record was closed when final documentation was received].)

[12] (E.g., American Arb. Assn., Commercial Arbitration Rules, rule 35 ["If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs"]; JAMS, Employment Arbitration Rules & Procedures, rule 20(h) ["If post-Hearing briefs are to be submitted the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs"].)

deadline that only a *provider* can extend and that imposes a substantial penalty for department delay. (Welf. & Inst. Code, § 14171, subd. (d) [deadline to accept an ALJ's decision can only be extended by "(1) [d]elay caused by a provider [or] [¶] (2) [e]xtensions of time granted a provider at its sole request or at the joint request of the provider and the department"].)

The Legislature's goal cannot be served unless the 300-day deadline is fixed and predictable. Setting the last date of the parties' final submissions as the triggering event for the deadline clock to start running provides that predictability. Allowing a hearing officer to *retroactively* set the triggering event for the deadline clock, as the ALJ did here, would undermine the Legislature's stated intent to give providers a remedy for delay. In that case, there would be no way for anyone to know when the deadline clock started and no way for the beneficiary of the deadline to effectively enforce its rights. "Statutes should be construed consistent with the legislative goals and should not be interpreted to create rights without remedies." (*In re Marriage of Dandona & Araluce* (2001) 91 Cal.App.4th 1120, 1124 [111 Cal.Rptr.2d 390].)

We recognize that our interpretation means that the Department here could never have timely accepted the ALJ's decision because no decision was made within 300 days of the closure of the record. But we believe that as between the Department and the provider, the Department should suffer the consequences of the ALJ's delay. The Legislature established the deadline to protect providers and to impose a duty of diligence on the Department. The Department is in a better position to address the possibility of delay since the Department has the right and duty to "establish administrative appeal processes to review grievances or complaints arising from the findings of an audit or examination." (Welf. & Inst. Code, § 14171, subd. (a).) For example, a 1997 amendment to section 14171 that was sponsored by the Department repealed a clause that had required ALJ's to provide proposed decisions within 180 days of record closure. (Compare Stats. 1997, ch. 220, § 40, with Stats. 1994, ch. 773, § 1, p. 3860.) We do not believe the Legislature could have intended that providers, who have no power to enforce compliance apart from the 300-day deadline, should be penalized because the Department failed to establish mechanisms to avoid delay. We therefore conclude that the trial court properly imposed the statutory penalty.

## DISPOSITION

The judgment is affirmed. The parties to bear their own costs on appeal.

Ashmann-Gerst, J., and Chavez, J., concurred.

A petition for a rehearing was denied April 19, 2006.