[No. B204634. Second Dist., Div. One. Aug. 14, 2009.]

D.C., a Minor, etc., et al., Plaintiffs and Appellants, v.
HARVARD-WESTLAKE SCHOOL et al., Defendants and Respondents.

COUNSEL

Robert S. Gerstein; and Jennifer L. Lynch for Plaintiffs and Appellants.

Musick, Peeler & Garrett, Stuart W. Rudnick and Kent A. Halkett for Defendants and Respondents.

OPINION

**MALLANO, P. J.**—A student and his parents filed this action against his school, alleging it was liable under the state's hate crimes laws (Civ. Code, §§ 51.7, 52.1) for death threats he received from classmates who misperceived his sexual orientation. The trial court ordered that all of the claims—the statutory hate crimes claim and several common law claims—be arbitrated in accordance with the school's enrollment contract, which contained not only an arbitration provision but also a provision entitling the "prevailing party" to attorney fees. The arbitrator found in favor of the school on all claims and awarded it over $521,000 in arbitral expenses and attorney fees.

The primary question on appeal is whether the arbitrator could impose a type of expense on plaintiffs they would not have been required to bear if the dispute had been heard in court. We conclude that because the hate crimes laws constitute unwaivable statutory rights comparable to antidiscrimination laws, such expenses are prohibited. Otherwise, the filing of hate crimes claims would be deterred. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 110–113 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*).)

In postarbitration proceedings, plaintiffs argued they were not liable for any type of arbitral expense they would not have had to pay in a court case. They also asserted that because the hate crimes laws authorize an award of attorney fees only to a prevailing *plaintiff* (see Civ. Code, §§ 52, subd. (b)(3), 52.1, subd. (h)), the arbitrator could not award attorney fees *against* them. We determine that although the trial court should have decided whether the arbitrator awarded such expenses and fees, the court failed to do so and found

only that plaintiffs' claims were properly submitted to arbitration. Thus, the judgment shall be reversed, and, on remand, the trial court shall take the necessary steps to ensure that plaintiffs do not pay any inappropriate expenses or fees.

## I

## BACKGROUND

The following allegations and facts are taken from the pleadings and the papers submitted in the trial court concerning the arbitration of the case.

D.C. was a student at Harvard-Westlake School (Harvard-Westlake), a private educational institution with a middle and an upper school in Los Angeles. D.C. filed this action against Harvard-Westlake and others through a guardian ad litem, his father. D.C.'s father and mother also pleaded claims in their own right. (We will refer to D.C. and his parents collectively as plaintiffs.)

### A. *The Original Complaint*

On April 25, 2005, plaintiffs filed this action against Harvard-Westlake, the board of directors, certain officers and administrators, and a faculty member (collectively School), alleging as follows.

While a student, D.C. was pursuing a career as a singer and an actor. He had a record album with a planned release date, had broadcast a song worldwide via satellite radio, and had played the leading role in a feature film presented at an internationally acclaimed film festival. He attended Harvard-Westlake's upper school.

D.C. maintained a Web site to promote his career in entertainment. The site allowed any member of the public to post comments in a "guestbook." Several students at Harvard-Westlake, using its computers, went to the Web site and posted death threats against D.C. and made derogatory comments about him. One post read, "I'm going to pound your head in with an ice pick." Another said, "Faggot, I'm going to kill you." A third stated, "You are an oversized faggot . . . . I just want to hit you in the neck—hard. . . . [G]o to the 405 [freeway] bridge and jump." A fourth read, "I hate fags . . . . You

need to be stopped." One student wrote, "I am looking forward to your death." Another commented, "Not only are you a massive fagmo, but must absolutely quit showing your face at my school. You are now officially wanted dead or alive." One post read, "I want to rip out your fucking heart and feed it to you." Several other posts couched threats with references to D.C.'s misperceived sexual orientation as a homosexual.

The students who posted the threats sought to destroy D.C.'s life, threatened to murder him, and wanted to drive him out of Harvard-Westlake and the community in which he lived. The Harvard-Westlake student newspaper, The Chronicle, ran more than one article on the matter.

When D.C.'s father read the threats at the Web site, he immediately informed Harvard-Westlake of the problem, believing that some of its students were responsible. The father also contacted the Los Angeles Police Department, which, in turn, notified the Federal Bureau of Investigation.

On the advice of the police, D.C. withdrew from Harvard-Westlake. He and his family moved to another part of California, where he went to a different educational institution. The Chronicle ran an article disclosing D.C.'s new residential location and the name of the school he was attending. The article also disclosed that postings at the Web site had referred to D.C. as a "faggot." The faculty advisor to the staff of The Chronicle approved the article before publication. Harvard-Westlake did not suspend or expel any of the students who admitted posting the threats.

The original complaint contained 11 causes of action: negligence; assault upon another with death threats and hate crimes; conspiracy to assault another with death threats and hate crimes; invasion of privacy; conspiracy to invade the privacy of another; defamation; conspiracy to defame another; intentional infliction of emotional distress; conspiracy to inflict emotional distress on another; negligent infliction of emotional distress; and fraud in the inducement of a contract. A statutory hate crimes claim was not pleaded.

The cause of action for negligence alleged that the School had failed to provide a safe school environment (see Ed. Code, former §§ 35294.20–35294.21, added by Stats. 2002, ch. 506, § 3). The cause of action for assault upon another with death threats and hate crimes sought to impose liability on the School for permitting students to use its computers to make the threats. The related conspiracy claim accused the School of protecting the students who posted the threats in order to preserve their

academic standings, to prevent colleges and universities from learning about their misconduct, and to protect the School's reputation; in addition, the School exposed plaintiffs to further harm by publishing an article in The Chronicle disclosing their new residential location and the name of D.C.'s new educational institution. The privacy and defamation claims alleged that defendants had published in a public forum false and derogatory comments about D.C.'s misperceived sexuality. The intentional and negligent infliction of emotional distress claims were premised on the preceding allegations. The last cause of action, for fraudulent inducement, alleged that D.C.'s parents enrolled him in Harvard-Westlake and paid a "substantial sum of money" in exchange for the school's promise to provide an environment free of verbal abuse and harassment. At the end of the complaint, plaintiffs prayed for an unspecified amount of general damages, special damages, and attorney fees on each cause of action. The complaint did not include as defendants either the students who had posted the death threats or their parents as guardians ad litem.

In the body of the complaint, the privacy and defamation claims each alleged that D.C.'s reputation had been damaged in an amount exceeding $10 million.

The case was assigned to Judge Victor H. Person.

B. *The Petition to Compel Arbitration*

On May 27, 2005, the School filed a petition to compel arbitration of all claims and to stay the civil action pending the outcome of arbitration. The petition was based on the contents of Harvard-Westlake's "Enrollment Contract," signed by D.C.'s father.

The Enrollment Contract consisted of five pages. The heading "PERMISSION TO ENROLL" appeared at the top of the first page, followed by the recitation, "I have read, initialed and agree to the enclosed *Terms & Conditions* . . . . I accept this offer of enrollment, certify that I am the legal custodial parent and hereby enroll my child at Harvard-Westlake." The fourth page was captioned "TERMS AND CONDITIONS." It stated at the top: "My signature on the *Enrollment Agreement* and initials below affirm that I have read this statement and have accepted *all* of its provisions." (Third italics added.)

Under "TERMS AND CONDITIONS," the contract contained an arbitration provision, stating: "I understand that any legal and actionable controversy or claim arising out of or relating to this Agreement (including but not limited to the determination of the scope and applicability of this Agreement

to arbitrate), the student's enrollment in/departure from Harvard-Westlake or the student's educational experience at Harvard-Westlake (including, but not limited to academic matters and extracurricular activities and community service) shall be submitted to final and binding arbitration to be held in Los Angeles County, California, before a single, neutral arbitrator in accordance with [Judicial Arbitration and Mediation Services, Inc.'s (JAMS)] Comprehensive Arbitration Rules and Procedures. This arbitration agreement applies during the term of this enrollment agreement and survives after the termination of the enrollment agreement."

JAMS rules, though not set forth in the contract, provided: "Each Party shall pay its *pro-rata* share of JAMS fees and expenses . . . , unless the Parties agree on a different allocation of fees and expenses." The contract did not establish a different allocation.

Also under "TERMS AND CONDITIONS" was an attorney fees provision, as follows: "In the event of any arbitration or litigation between the parties arising out of this agreement, or which relates in any way to the enrollment of the student at Harvard-Westlake, the prevailing party therein shall be allowed all reasonable attorneys' fees expended or incurred in such arbitration or litigation, to be recovered as part of the costs therein."

The next paragraph began, "I recognize that *alteration of any wording* in this Agreement will *nullify this offer* of enrollment." (Italics added.)

The end of the contract stated that tuition for the upcoming academic year was $21,400.

In its petition, the School argued that, based on the California Arbitration Act (Code Civ. Proc., §§ 1280–1294.2), plaintiffs' claims were subject to arbitration, and the civil action should be stayed until the arbitration was completed. The petition was scheduled to be heard on July 12, 2005.

On June 8, 2005, plaintiffs filed a first amended complaint. The School defendants remained substantially the same.[1] Some new defendants were added: The students who had allegedly posted the death threats on the Web site were sued through their parents as guardians ad litem (collectively Students).

The causes of action also underwent some changes. Nine, not 11, causes of action were alleged. The negligence claim (see Ed. Code, former

---

[1] Plaintiffs renamed as defendants Harvard-Westlake, the board of directors, Thomas C. Hudnut (the headmaster), Harry L. Salamandra, Jr. (the head of the upper school), and Kathleen Neumeyer (the faculty advisor to the staff of The Chronicle). Respondents consist of these defendants, excluding Neumeyer.

§§ 35294.20–35294.21) was abandoned. The previous claims for assault and conspiracy to commit assault with death threats and hate crimes were combined into a single cause of action that alleged violations of both the Ralph Civil Rights Act (Civ. Code, § 51.7) and the Tom Bane Civil Rights Act (Civ. Code, § 52.1). In general, those acts provide a civil remedy for hate crimes. D.C.'s parents, together with D.C., were plaintiffs on the hate crimes claim, alleging they had suffered emotional harm and economic damages, including moving expenses, caused by the threats. The privacy claim was replaced by a cause of action entitled "public disclosure of private facts." The defamation claim remained the same. A new cause of action for "false light" alleged that the School and the Students had falsely portrayed D.C. as a homosexual. The two emotional distress claims were realleged without change. A new cause of action sought to impose liability on the parents of the Students based on Civil Code section 1714.1, subdivision (a), which makes a parent liable, up to specified limits, for an injury or death caused by the willful misconduct of a minor child within the parent's custody and control. Another new cause of action, entitled "negligent supervision of students," alleged that the School had failed to prevent threats of violence, offensive language, and harassment. The ninth and last cause of action realleged the fraudulent inducement claim.

As before, the prayer for relief sought unspecified general and special damages and attorney fees and costs. The new cause of action for violation of the hate crimes laws sought injunctive relief. In the body of the first amended complaint, plaintiffs alleged that D.C.'s reputation had been damaged in an amount exceeding $10 million.

On June 28, 2005, plaintiffs filed opposition to the petition to compel arbitration. They argued: (1) D.C. was not bound by the Enrollment Contract or its arbitration provision because, as a minor, he had disaffirmed the contract; (2) the arbitrator lacked the authority to issue injunctive relief; (3) arbitration was improper as to the School because other parties (the Students) were not bound by the arbitration provision (see Code Civ. Proc., § 1281.2, subd. (c)); and (4) the arbitration provision was unenforceable on the ground that plaintiffs "would not be able to vindicate [their] statutory rights . . . in the province of arbitration," citing *Armendariz, supra,* 24 Cal.4th 83.

In the reply, the School argued that, after it filed the petition, plaintiffs could not amend their complaint—adding new causes of action, requests for relief, or defendants—in an effort to avoid arbitration. The School also asserted *Armendariz* did not preclude the arbitration of plaintiffs' claims because that decision did not apply to the hate crimes laws.

On July 8, 2005, one of the defendants filed a peremptory challenge (Code Civ. Proc., § 170.6), seeking to disqualify Judge Person. The challenge, which bore the wrong case number, was not filed in Judge Person's courtroom. (See *id.*, § 170.6, subd. (a)(2).) At the time of the hearing on the petition, Judge Person had not seen the challenge.

On July 12, 2005, the day of the hearing, Judge Person provided the parties with a tentative ruling granting the petition—compelling arbitration as to the School and staying the action as to the Students. The parties presented argument. Judge Person took the matter under submission.

By minute order dated July 28, 2005, Judge Person adopted the tentative as his final ruling, concluding that the arbitration provision in the Enrollment Contract encompassed plaintiffs' claims. The order also stated: "The Plaintiffs have tried (improperly) to amend their claims, adding claims against the parents of the students who made the allegedly offensive Web site postings. However, Plaintiffs cannot escape their obligation to arbitrate their claims against the school and school personnel simply by adding other claims and defendants. Were this the rule, arbitration agreements would be illusory. Instead the Court must simply stay those claims pending completion of the arbitration against the Harvard-Westlake Defendants."

With respect to the peremptory challenge, Judge Person wrote: "At the commencement of the hearing on the petition, counsel inquired as to whether the Court had been made aware of a peremptory challenge pursuant to [Code of Civil Procedure] Section 170.6. It was not aware of such a challenge as no record of the filing of a challenge in this particular case was established. If such a challenge is brought, of course, it limits the Court's power to move forward until it has ruled on the legal sufficiency and timeliness of such a challenge. At that time the Court's official records reflected that no such peremptory challenge had been filed in this case. Since the Court had nothing, officially, before it to rule upon, it was impossible for the Court to determine the legal sufficiency or timeliness of the alleged challenge. Under those circumstances, even though Plaintiff represented it had a service copy, the Court went forward with the hearing.

"Subsequent to taking the matter under submission in order to review the authority on the procedural issues contested by the Plaintiff during the hearing, Plaintiff's counsel apparently returned later the same morning of the hearing with a copy of a peremptory challenge that purported to be for this matter but contained the wrong case number (BC322406 instead of BC332406). The document had apparently been filed on July 8, 2005, but was not recorded anywhere except in the record of whatever case BC322406 represents. Since the error on the face of the peremptory challenge prevented

the Court from reviewing the matter prior to the commencement of the hearing on the petition, the Court finds it to be untimely as to that hearing. [¶] . . . [¶]

"As to ruling on the peremptory challenge, the Court having reviewed the challenge finds it to be timely filed as to all further proceedings and legally sufficient . . . . The Court accepts the challenge at this time. The case file is ordered to be delivered to [the master calendar department] forthwith for the purpose of being reassigned to another [courtroom]."

On August 11, 2005, plaintiffs filed a petition for a writ of mandate with this court, challenging Judge Person's refusal to disqualify himself before ruling on the petition to compel arbitration. Plaintiffs argued that Judge Person's order compelling arbitration was void and should be set aside. The School filed a preliminary opposition. By order dated August 23, 2005, we summarily denied the writ petition (B185040).

## C. *The Arbitration*

In November 2005, the arbitration commenced, the Honorable Judith M. Ryan serving as the arbitrator. The parties engaged in document productions, took 14 depositions, and retained a total of eight expert witnesses.

In May 2006, the School moved for "summary disposition" of all of plaintiffs' claims. Plaintiffs then filed a second amended complaint, adding three causes of action: (1) breach of contract, alleging the existence and breach of a contract consisting of the Enrollment Contract, the student honor code, and the student-parent handbook; (2) "intentionally tortious conduct"; and (3) negligence. The second and third of those claims were based on the investigation of the incident.

In August 2006, the School moved for summary disposition as to all of the claims in the *second* amended complaint. Plaintiffs filed opposition. In October 2006, the parties presented argument on the motion.

In a ruling dated October 26, 2006, the arbitrator granted the motion in part. She dismissed the hate crimes claim, finding that a federal statute (47 U.S.C. § 230) rendered the School immune from liability for the Students' misconduct, notwithstanding that some of the Students had used Harvard-Westlake's computers to post the death threats.[2] The claims for defamation and disclosure of private facts were dismissed as to D.C.'s parents

---

[2] The federal law states that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (47 U.S.C. § 230(c)(1).)

but not as to D.C. The "false light" claim was dismissed as duplicative of the defamation claim. And the "intentionally tortious conduct" claim was dismissed for failure to state a cognizable cause of action. The motion was denied in its entirety as to (1) the negligent infliction of emotional distress claim, which was brought by D.C. only; (2) the claim for negligent supervision of Students, brought by all plaintiffs; (3) the negligence claim, brought by all plaintiffs; and (4) the intentional infliction of emotional distress claim, which was not asserted against the School. The ruling, consisting of 10 pages, was served on counsel by mail and facsimile transmission on October 30, 2006.[3]

The surviving claims—all based on the common law—were heard by the arbitrator in an evidentiary hearing held on February 12–15, 20, and 22, 2007. The parties submitted closing briefs. In May 2007, the parties presented closing arguments.

In an "Interim Award" dated May 29, 2007, the arbitrator found in favor of the School on the merits of the claims. The arbitrator explained her reasoning in a 24-page opinion. She also concluded that the School was the prevailing party for purposes of the attorney fees provision in the Enrollment Contract and reserved jurisdiction to make a final award that would include attorney fees and costs. The Interim Award was served on counsel by mail and facsimile transmission on June 1, 2007.

The School filed an application for arbitration fees, attorney fees, and costs. The application sought $508,735.53 in attorney fees and costs, and $12,492.15 in arbitration fees and costs.

Plaintiffs countered with a motion to tax costs. D.C. argued for himself only that, as a minor, he had disavowed any financial obligations relevant to the arbitration. The arbitrator agreed and did not award any fees or costs against him. D.C.'s parents took issue with some of the specifics in the School's billing records, arguing for example that some of the attorneys' work should have been performed by nonattorneys and that excessive time had been spent on the case. The arbitrator rejected those contentions.

In an eight-page "Final Award" dated August 20, 2007, the arbitrator ordered D.C.'s parents to pay the School a total of $521,227.68 in arbitration fees, attorney fees, and costs. In other words, the arbitrator awarded the School *all* of its requested arbitral expenses and attorney fees. The award was served on counsel by mail and facsimile transmission on August 24, 2007.

---

[3] Our recitation of the background of the case should not be interpreted as a tacit approval of the arbitrator's decisions or of plaintiffs' implicit position that D.C.'s parents had standing to bring a claim under the hate crimes laws.

(With the exception of the arbitrator's initial ruling and the subsequent awards, we do not have the record of the arbitration proceedings.)

The School returned to the trial court, Judge Ernest M. Hiroshige presiding, and filed a petition to confirm the arbitration award. For their part, plaintiffs filed a petition to vacate the award. Each side filed an opposition to the other's petition.

The School's petition was straightforward: (1) Plaintiffs had agreed in the Enrollment Contract to arbitrate disputes with the School; (2) disputes subject to arbitration had arisen and had been arbitrated in accordance with the contract; and (3) the arbitrator had awarded arbitration fees, attorney fees, and costs as provided in the contract and JAMS rules.

In their petition to vacate the award, plaintiffs argued that Judge Person's order compelling arbitration was void because he should have been disqualified (see Code Civ. Proc., § 170.6) before he issued a final ruling on the petition to compel arbitration. In the alternative, plaintiffs asserted that the award of $521,227.68 violated their rights because, under *Armendariz, supra*, 24 Cal.4th 83, they could not be required to pay attorney fees or any type of arbitral expense they would not have incurred if the hate crimes claim had been adjudicated in court.

The petitions were heard on October 15, 2007. At the conclusion of the hearing, Judge Hiroshige granted the petition to confirm the arbitration award and denied the petition to vacate. He concluded that all of plaintiffs' claims were arbitrable but did not rule on whether the award of arbitral expenses and attorney fees was proper. A formal order and a judgment were filed the same day. Plaintiffs appeal from the judgment.

## II

## DISCUSSION

Because the relevant facts are not in dispute, we independently decide the issues raised on appeal. (See *Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1364–1365 [131 Cal.Rptr.2d 524]; *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 976 [41 Cal.Rptr.3d 48].)

Plaintiffs present three arguments. First, the peremptory challenge was timely and duly filed, rendering the order to compel arbitration void. Second, under *Armendariz, supra*, 24 Cal.4th 83, the arbitration award had to be vacated because plaintiffs were found liable for expenses unique to arbitration, that is, expenses they would not have incurred if they had pursued their

hate crimes claim in court. (For simplicity, we will refer to such arbitral expenses as "inappropriate.")[4] Third, plaintiffs assert they did not have to pay attorney fees notwithstanding the attorney fees provision in the Enrollment Contract.

We conclude, first, that the ruling on a peremptory challenge may be reviewed only by way of a petition for a writ of mandate and not on appeal from a final judgment. Plaintiffs challenged the ruling through such a petition, which we summarily denied. We therefore cannot review again whether the order compelling arbitration was void.

On the second issue, we agree that *Armendariz*'s prohibition of inappropriate arbitral expenses is fully applicable to plaintiffs' hate crimes claim.

Last, on the attorney fees issue, we conclude that the hate crimes laws prohibit an award of fees to a prevailing *defendant*.

With respect to relief, we conclude that the trial court, on remand, should take the necessary steps to ensure that plaintiffs do not pay any inappropriate arbitral expenses or any statutorily prohibited attorney fees—a task the trial court has yet to undertake.

## A. *Peremptory Challenge*

By statute, "[t]he determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding. The petition for the writ shall be filed and served within 10 days after service of written notice of entry of the court's order determining the question of disqualification." (Code Civ. Proc., § 170.3, subd. (d).) This law governs the ruling on a peremptory challenge (*id.*, § 170.6). (See *People v. Hull* (1991) 1 Cal.4th 266, 269–276 [2 Cal.Rptr.2d 526, 820 P.2d 1036]; *Guedalia v. Superior Court* (1989) 211 Cal.App.3d 1156, 1159–1163 [260 Cal.Rptr. 99]; *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166].) "[A] timely writ petition is the exclusive avenue for appellate court review whether the judge's disqualification is sought for cause (per CCP §170.1) or by peremptory challenge (per CCP §170.6); the ruling is neither directly appealable nor reviewable on appeal

---

[4] "Arbitral expenses" may include the arbitrator's compensation and travel expenses, the cost of renting a hearing room, and a fee to postpone a scheduled hearing. (See, e.g., *Gonzalez v. Menard, Inc.* (N.D.Ill. 2008) 534 F.Supp.2d 815, 820–821; *Boyd v. Town of Hayneville, AL* (M.D.Ala. 2001) 144 F.Supp.2d 1272, 1275–1276.)

from the subsequent final judgment." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2008) ¶ 15:125, p. 15-59 (rev. # 1, 2008), italics omitted.)[5]

Plaintiffs attacked Judge Person's ruling on the peremptory challenge by filing a writ petition in this court, which we summarily denied. On this appeal from the judgment, we cannot revisit whether the judge should have disqualified himself before granting the petition to compel arbitration. (See *Guedalia v. Superior Court, supra*, 211 Cal.App.3d at pp. 1161–1163.) His ruling stands as valid. (*Id.* at pp. 1161–1162 & fn. 3.)

## B. *Enforcement of the Arbitration Award*

In *Armendariz, supra*, 24 Cal.4th 83, the Supreme Court held that an arbitration conducted pursuant to a mandatory employment arbitration agreement must satisfy certain minimal criteria if the employee alleges the violation of an unwaivable statutory right. In *Armendariz*, the employees alleged a statutory cause of action for discrimination under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) and three common law claims for wrongful termination based on tort and contract theories of recovery. (*Armendariz*, at pp. 91–92.) The employees' claims were covered by an arbitration agreement imposed as a condition of employment.

As *Armendariz* explained: "[C]ertain statutory rights can be waived . . . . But arbitration agreements that encompass *unwaivable* statutory rights must be subject to particular scrutiny. This unwaivability derives from two statutes that are themselves derived from public policy. First, Civil Code section 1668 states: 'All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.' 'Agreements whose object, directly or indirectly, is to exempt [their] parties from violation of the law are against public policy and may not be enforced.' . . . Second, Civil Code section 3513 states, 'Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.' " (*Armendariz, supra*, 24 Cal.4th at p. 100, citations omitted, original italics.)

After determining that the FEHA created unwaivable statutory rights, the high court concluded (1) the arbitration agreement could not limit the FEHA's remedies; (2) the arbitration proceeding had to permit adequate

---

[5] In their appellate briefs, the parties did not address whether the ruling on a peremptory challenge may be reviewed on appeal. We requested and received supplemental briefing on the issue.

discovery; (3) the arbitrator had to provide a written award explaining the essential findings and conclusions supporting the award, followed by sufficient judicial review; and (4) the employer must "shoulder" the expenses of the arbitration that an employee would not have to bear if the dispute were tried in court. (*Armendariz, supra,* 24 Cal.4th at pp. 100–113.) Further, to the extent an arbitration agreement is silent as to these requirements, a court should find that the employer has impliedly agreed to them. (*Id.* at pp. 105–107, 112–113.)

In explaining why the employer should pay the employee's share of arbitral expenses, the court stated: "[A]rbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine [the Legislature's] intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court." (*Armendariz, supra,* 24 Cal.4th at p. 108.) " 'There is no doubt that parties appearing in . . . court may be required to assume the cost of filing fees and other administrative expenses, so any reasonable costs of this sort that accompany arbitration are not problematic. However, if an employee . . . is required to pay arbitrators' fees ranging from $500 to $1,000 per day or more, . . . in addition to administrative and attorney's fees, is it likely that he will be able to pursue his statutory claims? We think not.' " (*Ibid.*)

The court continued: "[W]hen an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any *type* of expense that the employee would not be required to bear if he or she were free to bring the action in court. This rule will ensure that employees bringing [unwaivable statutory] claims *will not be deterred* by costs greater than the usual costs incurred during litigation . . . ." (*Armendariz, supra,* 24 Cal.4th at pp. 110–111, second italics added.) "[It has been argued that] although employees may have large [arbitration] costs, the cost of arbitration is generally smaller than litigation, so that the employee will realize a net benefit from arbitration. Although it is true that the costs of arbitration are on average smaller than those of litigation, it is also true that [the] amount awarded is on average smaller as well. . . . The payment of large, fixed [arbitration] costs, especially in the face of expected meager awards, serves as a *significant deterrent* to the pursuit of [unwaivable statutory] claims." (*Id.* at p. 111, citation omitted, italics added.) "We therefore hold that a mandatory employment arbitration agreement that contains within its scope the arbitration of FEHA claims impliedly obliges the employer to pay all types of costs that are *unique to arbitration.*" (*Id.* at p. 113, italics added.)

*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064 [130 Cal.Rptr.2d 892, 63 P.3d 979] (*Little*) presented the question of whether the *Armendariz* requirements should apply to a common law claim for wrongful termination of employment in violation of public policy. Answering that question in the affirmative, the court explained: "A *Tameny* claim [(*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330])] is almost by definition unwaivable. '[The] public policy exception to the at-will employment rule must be based on policies "carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions . . . ." ' . . . Moreover, the public policy that is the basis for such a claim must be ' " 'public' in that it 'affects society at large' rather than the individual, must have been articulated at the time of discharge, and must be ' "fundamental" ' and ' "substantial." ' " ' . . . Thus, a legitimate *Tameny* claim is designed to protect a public interest and therefore ' "cannot be contravened by a private agreement." ' . . . [B]ecause an employer cannot ask the employee to waive *Tameny* claims, it also cannot impose on the arbitration of these claims such burdens or procedural shortcomings as to preclude their vindication. Thus, the *Armendariz* requirements are as appropriate to the arbitration of *Tameny* claims as to unwaivable statutory claims." (*Little*, at p. 1077, citations omitted.)

In a partial dissent in *Little*, Justice Baxter disagreed. Relying on an intervening decision by the United States Supreme Court (*Green Tree Financial Corp.-Ala. v. Randolph* (2000) 531 U.S. 79 [148 L.Ed.2d 373, 121 S.Ct. 513] (*Green Tree*)), Justice Baxter, joined by Justices Chin and Brown, went so far as to say: "I would overrule *Armendariz*'s arbitrary cost allocation formula. In its place, I would adopt *Green Tree*'s principle that if a party resists mandatory contractual arbitration of a statutory claim on grounds of undue cost, he must make a timely, particularized showing of the expected expense, and must also demonstrate that, in his particular case, this cost would make arbitration prohibitively expensive as compared to court litigation. Evidence on this issue could be presented to the court deciding a motion to compel arbitration. If the party opposing arbitration demonstrated prohibitive expense, the court could grant the motion to compel upon the condition that the proponent of arbitration accept, with the caveat discussed below, a more equitable allocation of costs.

". . . [I]nterference with the arbitration contract's cost provisions, express or implied by statute, should be countenanced only to the degree actually necessary to assure that mandatory resort to the arbitral forum *has not deterred vindication of a statutory claim.* For this reason, whatever pre-arbitration reallocation of costs may be necessary to ensure that the claimant *is not deterred in advance*, this allocation should be tentative only, and should be subject to readjustment once the true expenses and rewards of the arbitral

proceeding are known." (*Little, supra,* 29 Cal.4th at p. 1088 (conc. & dis. opn. of Baxter, J.), italics added.)

Simply put, the dissent in *Little* would have required trial courts to make a case-by-case determination as to whether the arbitration proceeding would impose prohibitive expenses on the particular plaintiff, while *Armendariz* "*categorically* imposes costs unique to arbitration on employers when un-waivable rights pursuant to a mandatory employment arbitration agreement are at stake." (*Little, supra,* 29 Cal.4th at p. 1084, italics added.) Under the categorical rule applied in *Armendariz* "the employer should pay the costs of a mandatory employment arbitration of statutory claims" (*Little,* at p. 1083), but the dissent in *Little* would "require[] a case-by-case analysis based on such factors as the employee's ability to pay the arbitration fees and the differential between projected arbitration and litigation fees" (*ibid.*).

In the unanimous decision in *Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495 [30 Cal.Rptr.3d 787, 115 P.3d 68] (*Boghos*), neither *Armendariz* nor *Little* was of any assistance to the plaintiff. There, a disabled insured brought suit against his disability insurer, alleging that the company had improperly stopped paying benefits. The disability policy contained an arbitration clause requiring the costs of the arbitration to be " 'equally split among the parties.' " (*Boghos,* at p. 500.) The insurer moved to compel arbitration. The trial court denied the motion. The Court of Appeal affirmed, relying on *Armendariz* and *Little* for the proposition that the insured could not be required to pay any type of expense in arbitration that he would not incur in court.

The Supreme Court reversed, stating: "[The insured] asks us to extend the holdings of *Armendariz, supra,* 24 Cal.4th 83, and *Little, supra,* 29 Cal.4th 1064, to insurance disputes and to declare the policy's arbitration clause unenforceable because it requires him to share with the Underwriters the costs of arbitration and the arbitrators' fees. We find no merit in the request. Even if the holdings in *Armendariz* and *Little* might conceivably be extended beyond the employment context to cover other types of unwaivable claims based on or tethered to statutes, [the insured's] claims for nonpayment of benefits and breach of the covenant of good faith and fair dealing cannot properly be so described. [His] claim that the Underwriters have failed to pay benefits under the policy is a claim for breach of contract, pure and simple. His claim that the Underwriters have, by failing to pay, violated the covenant of good faith and fair dealing may properly be described either as a tort claim . . . or as a special type of contract claim for which we allow tort damages . . . . [I]nsurance bad faith claims . . . cannot properly be described as tethered to a statute, in the sense that *Tameny* claims subject to arbitration under *Little* are necessarily ' "based on policies 'carefully tethered

to fundamental policies . . . delineated in constitutional or statutory provisions . . . .' " ' . . . While the business of insurance is sufficiently affected with a public interest to justify its regulation by the state . . . , the fact of regulation does not suffice to demonstrate that any given insurance-related claim entails an unwaivable statutory right, or that any given claim seeks to enforce a public policy articulated in a statute.

"In any event, we have not extended the *Armendariz/Little* cost-shifting rule to common law claims generally. The rule is a judicially created exception to Code of Civil Procedure section 1284.2, which provides that the parties to an arbitration agreement do share costs '[u]nless the arbitration agreement otherwise provides or the parties to the arbitration otherwise agree . . . .' We justified our creation of the exception in *Armendariz, supra,* 24 Cal.4th 83, by reasoning that section 1284.2 'is a default provision, and the agreement to arbitrate a statutory claim [e.g., a FEHA claim] is implicitly an agreement [by the employer] to abide by the substantive remedial provisions of the statute' . . . and to pay 'all types of cost that are unique to arbitration.' . . . The same reasoning fairly covers common law *Tameny* claims, which must be carefully tethered to statutory or constitutional provisions . . . , but not to common law claims generally. To extend *Armendariz* to the arbitration of claims not carefully tethered to statutory or constitutional provisions would seem an arbitrary refusal to enforce section 1284.2, a legislative act, and thus raise concerns about judicial policymaking . . . ." (*Boghos, supra,* 36 Cal.4th at pp. 507–508, citations & fn. omitted.)

In *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77 [7 Cal.Rptr.3d 267] (*Gutierrez*), the Court of Appeal extended *Armendariz*'s prohibition of inappropriate arbitral expenses to a dispute arising under a vehicle lease. There, the lessees sued a dealership under the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.) and the Vehicle Leasing Act (VLA) (Civ. Code, § 2985.7 et seq.) for failing to lease a vehicle at the advertised price. The dealership moved to compel arbitration based on an arbitration clause in the lease. The trial court denied the motion.

The Court of Appeal reversed and remanded. It recognized that the CLRA and the VLA confer unwaivable statutory rights (see *Gutierrez, supra,* 114 Cal.App.4th at p. 95 & fns. 14, 15) and that, under *Armendariz, supra,* 24 Cal.4th 83, the lessees were entitled to protection from inappropriate arbitral expenses (see *Gutierrez,* at pp. 94–101). Nevertheless, the court concluded that *Armendariz*'s categorical rule was not applicable and that a plaintiff's ability to pay arbitral expenses in a *consumer* dispute should be determined on a case-by-case basis. As the court noted, the governing rules of the American Arbitration Association (AAA) permit the arbitrator to allocate costs " 'as appropriate.' " (*Gutierrez,* at p. 99.) In addition, the California Arbitration Act contains provisions for consumer arbitrations that limit the

arbitrator's authority to impose inappropriate expenses on a plaintiff (Code Civ. Proc., § 1284.3, subds. (a), (b)). (See *Gutierrez*, at pp. 97–100 & fn. 18.) The court concluded that the AAA rules, together with the consumer provisions of the arbitration act, "ensure[] that *consumers* will not be deterred from pursuing their statutory claims by the fear that the arbitrator will allocate unaffordable fees to them." (*Gutierrez*, at pp. 99–100, italics added.)

In *Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court* (2005) 133 Cal.App.4th 396 [34 Cal.Rptr.3d 659] (*Independent Assn.*), the Court of Appeal extended *Armendariz*'s prohibition of inappropriate arbitral expenses to a dispute arising under a franchise agreement. Several franchisees of Mail Boxes, Etc., filed suit against their franchisor, alleging common law and statutory claims. The statutes included the Franchise Investment Law (Corp. Code, § 31000 et seq.), the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.), and the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). As the court noted, "These statutory claims affect the public interest and appear to fall all or in part within the rules of *Armendariz, supra,* 24 Cal.4th 83, and *Boghos, supra,* 36 Cal.4th 495." (*Independent Assn.,* at p. 416.) Emphasizing that the applicable arbitration rules (AAA) permitted the arbitrator to apportion arbitral expenses as he or she found "appropriate," the court adopted a case-by-case analysis to determine the amount of arbitral expenses a plaintiff should pay. (See *Independent Assn., supra,* 133 Cal.App.4th at pp. 416–417.)

We now turn to the statutory claim here to decide whether it is subject to *Armendariz*'s prohibition of inappropriate arbitral expenses and, if so, whether the categorical rule or a case-by-case analysis should apply in implementing that prohibition.

### 1. *Unwaivable Statutory Rights*

"Every year, thousands of Americans are victims of . . . hate crimes. Each one of these crimes has a ripple effect in our communities. The pain and injustice of such crimes tear at the fabric of our democratic society, creating fear and tensions that ultimately affect us all. [¶] Schools are not immune from such intolerance and violence. Teenagers and young adults account for a significant proportion of the country's hate crimes—both as perpetrators and as victims. Hate-motivated behavior, whether in the form of ethnic conflict, harassment, intimidation, or graffiti, is often apparent on school grounds." (U.S. Dept. of Education, Office of Elementary and Secondary Education Safe and Drug-Free Schools Program, Preventing Youth Hate Crime (1998) p. 1 <http://www.usdoj.gov/crs/publist.html> [as of Aug. 14, 2009].)

In 2007, the most common type of hate crime in Los Angeles County was motivated by racial, ethnic, or national origin bias (68 percent), and the

second largest group of hate crimes was motivated by sexual orientation animus (14 percent); schools ranked fourth in the location of hate crimes (10 percent). (L.A. County Com. on Human Relations, 2007 Hate Crime Report, pp. 5–6 <http://humanrelations.co.la.ca.us/hatecrime/hatecrimereport.htm> [as of Aug. 14, 2009].) From 2006 to 2007, hate crimes in Los Angeles County rose 28 percent, from 594 to 763 incidents, the highest in five years. (*Id.* at p. 5.)

■ Here, plaintiffs' hate crimes claim was based on Civil Code sections 51.7 and 52.1. At the time of the pertinent events, Civil Code section 51.7, the Ralph Civil Rights Act, provided: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive." (Civ. Code, former § 51.7, subd. (a), as amended by Stats. 1994, ch. 407, § 1, p. 2269.) A person aggrieved by a violation of the Ralph Civil Rights Act may bring a civil action and recover actual damages, a civil penalty of $25,000, exemplary damages, and an award of attorney fees. (Civ. Code, § 52, subds. (b), (c), as amended by Stats. 1991, ch. 839, § 2, pp. 3720–3721.)

Civil Code section 52.1, the Tom Bane Civil Rights Act, states: "(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action . . . in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . .

"(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, [the same] damages [available] under [the Ralph Civil Rights Act], injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." (Civ. Code, § 52.1, subds. (a), (b), as amended by Stats. 2001, ch. 261, § 2.)

The legislative history of the hate crimes laws shows they were enacted for a " 'public reason.' " (*Armendariz, supra,* 24 Cal.4th at p. 100.)

According to one court: "The history of [Civil Code] section 51.7 indicates the legislation was referred to as the Ralph Civil Rights Act and enacted in 1976 as part of Assembly Bill No. 2986 (1975–1976 Reg. Sess.) . . . . An Assembly Committee report stated that while there were 'numerous state and federal laws providing for full and equal civil rights protections in employment, housing, and access to public accommodations and facilities,' there was no specific prohibition protecting individuals from 'violence because of their race, religion, color, ancestry, or national origin.' . . .[6] The report continues, 'Although it is impossible to estimate the instances of violence against persons in California because of race, color, religion or other factors, *there have been enough occurrences such as the one in Taft, California last year where Black college students were threatened with violence and chased out of town* to signify a possible need for greater protection of this fundamental right . . . . This measure declares that all persons have a right to be free from violence or threat of violence committed against their persons or property because of race, color, religion, ancestry, national origin, political affiliation, or position in a labor dispute.' . . . [¶] . . . [¶]

"The second statute on which [the plaintiff's complaint] was based, [Civil Code] section 52.1, was enacted a decade later as part of Assembly Bill No. 63 (1987–1988 Reg. Sess.) . . . and is known as the Tom Bane Civil Rights Act. It was intended to supplement the Ralph Civil Rights Act as an additional legislative effort to deter violence . . . . The stated purpose of the bill was 'to fill in the gaps left by the Ralph Act' by allowing an individual to seek relief to prevent the violence from occurring before it was committed and providing for the filing of criminal charges . . . .

"The Assembly Committee on Public Safety reported, 'The Attorney General's office states that the number of crimes which are committed because of the victim's racial, ethnic, religious, or other minority status are increasing, that members of minority groups increasingly believe they are threatened by attack or harassment, and that existing law is inadequate to protect them. They also stated that existing civil rights statutes do little to deter hate violence because there are no criminal penalties . . . . The purpose of this bill is to give law enforcement officials clear effective authority to prevent acts of hate violence, and to deter such conduct by establishing serious criminal penalties' and by '[a]llow[ing] an individual, or the Attorney General, district attorney, or city attorney, to bring an action to enjoin crimes of hate violence where they are threatened.' . . .

---

[6] In 1984, the Ralph Civil Rights Act was amended to include sexual orientation as a protected characteristic. (See Stats. 1984, ch. 1437, § 1, p. 5037.)

"The legislative history reveals that the broad and plain language of [Civil Code] sections 51.7 and 52.1 was chosen to provide protection from discriminatory violence and intimidation, and from threats, intimidation and coercion that denied the civil rights of others. The creation of civil causes of action by victims of such conduct was at the heart of the legislation." (*Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441, 1446–1448 [39 Cal.Rptr.3d 706], citations omitted, italics added.)

■ As explained by Justice Baxter in *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820 [11 Cal.Rptr.3d 692, 87 P.3d 1]: "The legislative history of [Civil Code] section 52.1 clearly reflects that it was originally enacted 'to stem a tide of hate crimes.' . . . Nearly every court which has construed this statute has recognized that in light of its original purpose—to combat hate crimes—a violation of [Civil Code] section 52.1 requires a showing that the defendant acted with discriminatory animus, i.e., an intent to interfere 'by threats, intimidation, or coercion' ([Civ. Code,] § 52.1, subd. (a)) with the victim's exercise or enjoyment of his or her constitutional or statutory rights, based on the victim's actual or perceived racial, ethnic, religious, or sexual orientation or other minority status . . . .

"[Civil Code] [s]ection 52.1, commonly referred to as the 'Tom Bane Civil Rights Act' or the 'Bane Act,' was enacted in 1987 as part of a renewed effort to combat the disturbing rise in 'hate crimes,' or, put otherwise, the rising incidence of civil rights violations motivated by hatred and discrimination. This purpose of the legislation is undeniably evidenced by both its legislative history and the case law interpreting it, including several decisions of this court.

"The Legislature's focused effort to combat discriminatory and pernicious conduct often referred to as hate crimes began with the 1976 enactment of Civil Code section 51.7, commonly referred to as the 'Ralph Civil Rights Act' or the 'Ralph Act.' . . . The obvious purpose of the Ralph Act is to declare unlawful, and civilly actionable, any *acts of violence or intimidation by threats of violence* directed against any individual because of his actual or perceived membership in a minority or similarly protected class. [¶] . . . [¶]

"In this same vein, 10 years later, the Legislature enacted [the Bane Act (Civ. Code, § 52.1),] to further address the rising tide of hate crimes in California . . . . [¶] . . . [¶]

"[The] central provisions of the Bane Act have not been substantively changed since its enactment nearly 20 years ago . . . .

"From its inception, the Bane Act's purpose has been to specifically target unlawful conduct motivated by discriminatory animus that interferes with the

victim's enjoyment of statutory or constitutional civil rights . . . . [T]he 'key issue' in the enactment of the Bane Act [was] whether there should be 'additional civil and criminal penalties for crimes which are committed because of the victim's racial, ethnic, religious, sexual orientation or other minority status?' . . .

"The Senate Report explained . . . that under the then current law, i.e., the Ralph Act, quoted above, hate crimes perpetrated through acts of violence or threats of violence were subject to considerably expanded civil penalties . . . . However, due to the inadequacy of that law and the rise in hate crimes, the stated purpose of the Bane Act was to subject 'the use of force or threats to interfere with the free exercise of one's constitutional rights' . . . , based on the victim's membership or perceived membership in one of the enumerated protected classes, to both civil and criminal remedies. In other words, what the Bane Act did at its inception was to add 'threats, intimidation or coercion' to the already proscribed 'violence, or threats of violence' sanctioned under the Ralph Act, where any such conduct interferes with or attempts to interfere with the statutory and constitutional rights of persons in minority or similarly protected classes, or who were perceived by the defendant to be members of such protected classes." (*Venegas v. County of Los Angeles, supra,* 32 Cal.4th at pp. 845–847 (conc. opn. of Baxter, J.), citations, fn. & some italics omitted.)

Thus, "[California's] 'hate crimes' law[s] clearly establish[] that crimes motivated by bigotry and bias are against the public policy of the state." (*Webb v. Puget Sound Broadcasting Co.* (1998) 1998 Wn.App. Lexis 1795, p. *9 [138 Lab.Cas.(CCH) ¶ 58,612, p. 89,647, 1998 WL 898788, p.*3].) "[D]epending on the circumstances, insults or harassment directed to individuals on the basis of historically disfavored personal characteristics more readily transgress contemporary *social bounds* than do other forms of antagonistic behavior." (*Williams v. Tri-Met* (1998) 153 Or.App. 686, 691 [958 P.2d 202, 204–205].) To be specific, "[p]roviding a safe and non-discriminatory environment for students obviously serves the public interest . . . . In addition, fostering tolerance and thereby decreasing hate crimes among students is in the public interest." (*Doe v. Perry Community School Dist.* (S.D. Iowa 2004) 316 F.Supp.2d 809, 839, citation omitted.)

In upholding a state hate crimes law against a free speech challenge under the First Amendment (U.S. Const., 1st Amend.), the United States Supreme Court explained: "[T]he Wisconsin statute singles out for enhancement bias-inspired conduct because this conduct is thought to inflict greater individual and *societal harm.* For example, according to the State and its *amici*, bias-motivated crimes are more likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite *community*

*unrest* . . . . The State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases. As Blackstone said long ago, 'it is but reasonable that among crimes of different natures those should be most severely punished, which are the most destructive of the *public safety and happiness.*' " (*Wisconsin v. Mitchell* (1993) 508 U.S. 476, 487–488 [124 L.Ed.2d 436, 113 S.Ct. 2194, 2201], quoting 4 Blackstone, Commentaries 16, italics added, citations omitted.)

■ In short, "[t]here is no question that the statutory rights established by the [Ralph Civil Rights Act and the Tom Bane Civil Rights Act] are 'for a public reason.' " (*Armendariz, supra,* 24 Cal.4th at p. 100.) Thus, the hate crimes laws constitute unwaivable statutory rights.

### 2. *Categorical Rule or Case-by-case Analysis*

*Armendariz* adopted a categorical rule for arbitral expenses, holding that an employer must pay any type of expense unique to arbitration if the plaintiff seeks to vindicate an unwaivable statutory right. (*Armendariz, supra,* 24 Cal.4th at pp. 100–101, 113.) The underlying rationale for the categorical rule is to ensure that the cost of arbitration does not deter a plaintiff from bringing a claim. (*Id.* at p. 111.) "To be sure, it would be ideal to devise a method by which the employee is put in exactly the same position in arbitration, costwise, as he or she would be in litigation. But the factors going into that calculus refuse to admit ready quantification. Turning a motion to compel arbitration into a mini-trial on the comparative costs and benefits of arbitration and litigation for a particular employee would not only be burdensome on the trial court and the parties, but would likely yield speculative answers. Nor would there be an advantage to apportioning arbitration costs at the conclusion of the arbitration rather than at the outset. Without clearly articulated guidelines, such a postarbitration apportionment would create a sense of risk and uncertainty among employees that could discourage the arbitration of meritorious claims." (*Ibid.*)

In *Armendariz, supra,* 24 Cal.4th 83, the court's analysis of the requisite safeguards in arbitration, including the prohibition of inappropriate arbitral expenses, was grounded on the *nature* of the *cause of action*—an unwaivable statutory right. (See *id.* at pp. 99–113.)

In *Little, supra,* 29 Cal.4th 1064, the court discussed the *Armendariz* requirements, stating: "One . . . long-standing ground for refusing to enforce a contractual term is that it would force a party to forgo unwaivable public rights . . . . [¶] . . . [W]hile we recognize that a party compelled to arbitrate such rights does not waive them, but merely ' "submits to their resolution in

an arbitral, rather than a judicial, forum" ' . . . , arbitration cannot be misused to accomplish a de facto waiver of these rights. Accordingly, although the *Armendariz* requirements specifically concern arbitration agreements, they do not do so out of a generalized mistrust of arbitration per se . . . , but from a recognition that *some* arbitration agreements and proceedings may harbor terms, conditions and practices that undermine the vindication of unwaivable rights. The *Armendariz* requirements are therefore applications of general state law contract principles regarding the unwaivability of public rights to the unique context of arbitration . . . ." "[T]here is no reason under *Armendariz*'s logic to distinguish between unwaivable statutory rights and unwaivable rights derived from common law." (*Little*, at p. 1079, citations omitted, original italics.)

And in *Boghos, supra*, 36 Cal.4th 495, where the court declined to extend the *Armendariz* requirements to an arbitration between a disabled plaintiff and his disability insurer, the court emphasized that the plaintiff had asserted common law claims as opposed to a claim based on an unwaivable statutory right or a claim tethered to a statutory or constitutional provision. (*Boghos*, at pp. 506–508.) Again, the nature of the cause of action determined whether *Armendariz* applied. (*Boghos*, at pp. 506–508.)

■ The *Armendariz-Little-Boghos* trilogy recognizes that certain rights—unwaivable statutory rights or fundamental rights delineated in constitutional or statutory provisions—are so important in our society that their enforcement should not be chilled by the threat of expenses unique to arbitration. Under *Armendariz, supra*, 24 Cal.4th 83, all employees are treated the same—categorically—for purposes of arbitral expenses because discrimination in employment is an anathema that should not be tolerated as a matter of public policy. Similarly, under *Little, supra*, 29 Cal.4th 1064, a common law—*Tameny*—claim for wrongful termination of employment, which is based on a fundamental public policy tethered to a statute or constitutional provision, must be arbitrated without imposing costs that would not be incurred in court. And *Boghos* held that *Armendariz* does not apply to a dispute of *private* concern—an insured's contention that his insurer wrongfully discontinued his benefits.

In the present case, the public nature of plaintiffs' statutory rights is legally indistinguishable from the nature of the rights discussed in *Armendariz* and *Little*, and plaintiffs' rights should be equally protected.

The FEHA, at issue in *Armendariz*, provides a remedy for adverse employment actions taken for an improper reason: an employee's or applicant's "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual

orientation." (Gov. Code, § 12940, subd. (a).) The Ralph Civil Rights Act provides a remedy for violence and threats of violence made for virtually the same reasons. (See Civ. Code, §§ 51.7, subd. (a), 51, subds. (b), (e).) The legislative histories of the Ralph Civil Rights Act and the FEHA illustrate the similarity of the two statutory schemes: "[A] central feature of [the Ralph Civil Rights Act] was to afford an individual the opportunity to file immediately a private civil action at the same time he or she pursued a complaint with the Fair Employment Practices Commission (FEPC) [now the Fair Employment and Housing Commission] . . . . Previously, a person filing a complaint with the FEPC would have been precluded from concurrently initiating a private civil action *on the same matter.* [By amendment, the Legislature] allowed for both a private civil remedy and the enforcement mechanisms of the FEPC." (*Stamps v. Superior Court, supra,* 136 Cal.App.4th at p. 1447, citation omitted, italics added; see Civ. Code, § 52, subds. (e), (f).) Indeed, a cause of action under the Ralph Civil Rights Act may arise in the employment setting. (See, e.g., *Stamps,* at pp. 1444, 1456–1459; *Burnette v. Godshall* (N.D.Cal. 1993) 828 F.Supp. 1439, 1446, affd. *sub nom. Burnette v. Lockheed Missiles & Space Co.* (9th Cir. 1995) 72 F.3d 766; *Diem v. City and County of San Francisco* (N.D.Cal. 1988) 686 F.Supp. 806, 812.)

*Little* extended *Armendariz* to employees who are terminated in violation of "fundamental [public] policies that are delineated in *constitutional or statutory provisions."* (*Little, supra,* 29 Cal.4th at p. 1077, italics added.) Similarly, the Tom Bane Civil Rights Act provides a remedy where a person receives threats that interfere with "the rights secured by the Constitution or laws of this state [or of the United States]." (Civ. Code, § 52.1, subd. (a).) The Tom Bane Civil Rights Act also applies to threats in the workplace. (See *Stamps v. Superior Court, supra,* 136 Cal.App.4th at pp. 1456–1459.)

■ Claims under the hate crimes laws should not be discouraged by the possibility that an alleged victim will incur arbitral expenses beyond the costs payable in court. A case-by-case analysis would simply lead to "a mini-trial on the comparative costs and benefits of arbitration and litigation for a particular [plaintiff and] would not only be burdensome on the trial court and the parties, but would likely yield speculative answers [that would deter the bringing of hate crimes claims]." (*Armendariz, supra,* 24 Cal.4th at p. 111.) Accordingly, we adopt *Armendariz'*s categorical rule in this action: Because a student and his parents filed suit against a school, seeking remedies under the California hate crimes laws (Civ. Code, §§ 51.7, 52.1), neither the student nor his parents may be required to pay any type of arbitral expense that would not be imposed were the dispute adjudicated in court.

We acknowledge that *Gutierrez, supra,* 114 Cal.App.4th 77, and *Independent Assn., supra,* 133 Cal.App.4th 396, adopted a case-by-case

analysis in imposing arbitral expenses. In *Gutierrez*, however, the applicable arbitration rules (AAA) and the provisions of the arbitration act (Code Civ. Proc., § 1284.3, subds. (a), (b)) "ensure[d] that consumers will not be deterred from pursuing their statutory claims by the fear that the arbitrator will allocate unaffordable fees to them." (*Gutierrez*, at p. 100.) Similarly, in *Independent Assn.*, the arbitration rules (AAA) did not allow the arbitrator to impose inappropriate arbitral expenses on the plaintiffs. (*Independent Assn.*, at pp. 416–417.)

In this action, the applicable arbitration rules (JAMS) *require* the arbitrator to impose arbitration fees and costs on the parties on a pro rata basis. The Enrollment Contract states that the prevailing party *shall* be awarded attorney fees. The arbitration act (Code Civ. Proc., §§ 1280–1294.2) does not address or limit the imposition of expenses in a hate crimes dispute. Thus, the arbitration rules and the arbitration act fail to "ensure[] that [hate crimes plaintiffs] will not be deterred from pursuing their statutory claims." (*Gutierrez, supra*, 114 Cal.App.4th at p. 100.) Further, unlike *Gutierrez* and *Independent Assn.*, this case involves death threats motivated by a statutorily protected personal characteristic; it is not a vehicle leasing transaction or a business arrangement gone awry. Consequently, a claim under the hate crimes laws should not be subject to a case-by-case analysis.

We necessarily reject the School's argument that *Armendariz*'s prohibition of inappropriate arbitral expenses is limited to mandatory *employment* agreements—those imposed as a condition of *employment*. (See *Boghos, supra*, 36 Cal.4th at p. 507 [assuming, without deciding, that "the holdings in *Armendariz* and *Little* might conceivably be extended beyond the employment context to cover other types of unwaivable claims based on . . . . statutes . . ."]; *Gutierrez, supra*, 114 Cal.App.4th at pp. 95–97 [Supreme Court has not decided whether *Armendariz*'s categorical rule applies to arbitration of consumer claims].) Like the FEHA claim in *Armendariz*, plaintiffs' hate crimes claim was—in the words of the trial court—subject to "a *mandatory* arbitration provision that requires arbitration of any legal controversy or claim arising out of or relating to the [Enrollment Contract]." (Italics added.) Here, arbitration was imposed as a condition of enrolling D.C. in Harvard-Westlake.[7]

Both *Gutierrez, supra*, 114 Cal.App.4th 77, and *Independent Assn., supra*, 133 Cal.App.4th 396, extended *Armendariz*'s prohibition of inappropriate

---

[7] The Enrollment Contract, which contained the arbitration provision, required one of the student's parents to read and accept *all* of the contract's terms and conditions without "alteration of any wording."

arbitral expenses beyond the employment context—to vehicle leases and store franchise agreements, respectively. California's hate crimes laws deserve nothing less.

As Division Seven of this district observed: "[W]e see no reason why *Armendariz*'s 'particular scrutiny' of arbitration agreements should be confined to claims under FEHA. Rather, under the Supreme Court's analysis, such scrutiny should apply to the enforcement of rights under *any* statute enacted 'for a *public reason.*' " (*Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 180 [116 Cal.Rptr.2d 671], italics added.) "[*Armendariz*] itself suggests its minimum requirements for arbitration of statutory claims apply to claims under the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.)." (*Mercuro*, at p. 180, fn. 26; see *Kristian v. Comcast Corp.* (1st Cir. 2006) 446 F.3d 25, 37–64 [arbitration agreement must permit plaintiffs to vindicate statutory rights under federal and state antitrust laws]; *Whitney v. Alltel Communications, Inc.* (Mo.Ct.App. 2005) 173 S.W.3d 300, 310–314 [contractual provision requiring arbitration of dispute between customer and telephone service provider was unenforceable because it prevented customer from vindicating rights under Missouri's Merchandising Practices Act (Mo. Rev. Stat. § 407.010 et seq.)].)

### 3. *Attorney Fees*

■ Although we have been discussing arbitral expenses up to this point, a similar analysis applies to the provision in the Enrollment Contract stating that the "prevailing party" in "any arbitration or litigation" "shall be allowed all reasonable attorneys' fees." "[A]n agreement to arbitrate a statutory claim implicitly *incorporates* 'the substantive and remedial provisions of the statute' so that parties to the arbitration would be able to vindicate their ' " 'statutory cause of action in the arbitral forum.' " ' " (*Armendariz, supra,* 24 Cal.4th at p. 103, italics added.) "Obviously, [the law] cannot be read as holding that an arbitration agreement is enforceable no matter what rights it waives or what burdens it imposes . . . . Such a holding would be fundamentally at odds with our understanding of the rights accorded to persons protected by public statutes . . . ." (*Id.* at pp. 101–102, citation omitted.)

■ The Ralph Civil Rights Act and the Tom Bane Civil Rights Act expressly provide that a court may award attorney fees only to *the plaintiff.* Neither act permits an award of attorney fees to a *defendant,* even if the defendant prevails. (See Civ. Code, §§ 52, subd. (b)(3) ["[w]hoever denies the right provided by [the Ralph Civil Rights Act] . . . is liable . . . [¶] . . . [¶] . . . [for] [a]ttorney's fees as may be determined by the court"], 52.1, subd. (h) [under Tom Bane Civil Rights Act, "the court may award the petitioner or

plaintiff reasonable attorney's fees"].) Thus, the attorney fees provisions in the hate crimes laws are deemed to be a part of the Enrollment Contract (see *Armendariz, supra,* 24 Cal.4th at p. 103) and trump the contract's conflicting "prevailing party" provision (see *ibid.; Graham Oil v. ARCO Products Co.* (9th Cir. 1994) 43 F.3d 1244, 1247–1248 [remedy provisions of statutes prevail over conflicting provisions of arbitration agreement], cited with approval in *Armendariz, supra,* 24 Cal.4th at p. 103; *McCaskill v. SCI Management Corp.* (7th Cir. 2002) 298 F.3d 677, 683–686 (conc. opn. of Rovner, J.) [same]).

Further, the Legislature knows how to draft a statute to authorize an award of attorney fees to the "prevailing party"—the plaintiff *or* the defendant— where it so desires. For instance, under the FEHA, the *party* that prevails is entitled to attorney fees in the discretion of the trial court. (See Gov. Code, § 12965, subd. (b).) Although the attorney fees provision in the FEHA does not distinguish between prevailing plaintiffs and prevailing defendants, the courts treat them differently by routinely awarding fees to a prevailing *plaintiff* but denying fees to a prevailing *defendant* unless the plaintiff's claim is unreasonable, frivolous, meritless, or vexatious. (*Mangano v. Verity, Inc.* (2008) 167 Cal.App.4th 944, 948–949 [84 Cal.Rptr.3d 526].) This standard discourages frivolous suits "while providing adequate support and incentive for meritorious actions." (*Id.* at p. 951.) "A routine allowance of attorney fees to successful defendants in [civil rights] suits might effectively discourage suits in all but the clearest cases, and inhibit earnest advocacy on undecided issues." (*United States Steel Corp. v. U.S.* (3d Cir. 1975) 519 F.2d 359, 364–365.)

"[T]he availability of costs and attorneys fees to prevailing plaintiffs is integral to making the [hate crimes laws] an effective piece of . . . legislation, increasing the financial feasibility of bringing suits under the statute." (*Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1086 [90 Cal.Rptr.2d 334, 988 P.2d 67].) As explained by one court in an analogous context: "The Cartwright Act [(Bus. & Prof. Code, § 16700 et seq.)] contains a [one-way attorney fees] provision that allows an award of attorney fees to a prevailing plaintiff but not to a prevailing defendant . . . . Such nonreciprocal fee provisions 'are created by legislators as a deliberate stratagem for advancing some public purpose, usually by encouraging more effective enforcement of some important public policy.' . . . The public policy implicit in the [one-way] provision . . . is to encourage injured parties to broadly and effectively enforce the Cartwright Act 'in situations where they otherwise would not find it economical to sue.' . . . The Legislature clearly intended to give special treatment to antitrust claims under the Cartwright Act by creating this one-way fee-shifting right for a successful plaintiff but not for a defendant who successfully defends such a claim." (*Carver v. Chevron U.S.A., Inc.* (2004) 119 Cal.App.4th 498, 503–504 [14 Cal.Rptr.3d 467], citations

omitted; accord, *McCaskill v. SCI Management Corp., supra,* 298 F.3d at pp. 683–686 (conc. opn. of Rovner, J.) [statutory attorney fees provision favoring plaintiff advances enforcement and remedial effect of antidiscrimination law].)

The possibility of an award of attorney fees against the plaintiff in a hate crimes case would discourage such litigation. By analogy, *Armendariz* condemned the imposition of inappropriate arbitral expenses because they would deter the pursuit of unwaivable statutory rights. (*Armendariz, supra,* 24 Cal.4th at pp. 107–113.)

The one-way attorney fees provisions in the hate crimes laws serve a public purpose: to increase the financial feasibility of bringing suits under those laws. (Cf. *Broughton v. Cigna Healthplans, supra,* 21 Cal.4th at p. 1086; *Carver v. Chevron U.S.A., Inc., supra,* 119 Cal.App.4th at p. 504.) Thus, the one-way provisions are unwaivable statutory rights (see *Armendariz, supra,* 24 Cal.4th at p. 100) and render the award of attorney fees in this case invalid to the same extent as an award of inappropriate arbitral expenses.

### 4. *Relief on Remand*

This case is distinguishable from *Armendariz* on procedural grounds. *Armendariz* was decided on appeal from the denial of a petition to *compel* arbitration. The arbitration proceedings had not yet begun. The high court prohibited inappropriate arbitral expenses to ameliorate the deterrent effect they would have on the bringing of unwaivable statutory claims. (See *Armendariz, supra,* 24 Cal.4th at pp. 107–108, 111–112; *Little, supra,* 29 Cal.4th at pp. 1084–1085; *Gutierrez, supra,* 114 Cal.App.4th at pp. 95, 99–100.) In contrast, we are reviewing a *confirmed* arbitration award. The arbitration hearing has concluded. And the arbitrator imposed more than $521,000 in arbitral expenses and attorney fees on D.C.'s parents.

In the trial court, plaintiffs asserted in support of their petition to vacate the arbitration award that the arbitrator had imposed inappropriate arbitral costs and unauthorized attorney fees, thereby violating *Armendariz, supra,* 24 Cal.4th at pages 107–113, and the attorney fees provisions of the hate crimes laws. The School argued below that, under *Armendariz,* all of plaintiffs' causes of action were properly sent to arbitration. The trial court adopted the School's position and did not analyze the award of arbitral expenses or attorney fees to determine their propriety. Thus, the trial court erred by not protecting against the imposition of expenses and fees that could interfere with the vindication of unwaivable statutory rights. (See *Gutierrez, supra,* 114 Cal.App.4th at p. 100.)

In examining the arbitral expenses and attorney fees imposed by the arbitrator, "[the trial court's] review may exceed the narrow scope envisioned

by the California Arbitration Act . . . [because] *expanded* judicial review was contemplated by both the United States and California Supreme Courts to ensure that statutory claims can be vindicated in the arbitral forum. [Citations.]" (*Gutierrez, supra,* 114 Cal.App.4th at p. 100, citation omitted, italics added, distinguishing *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 6, 11, 33 [10 Cal.Rptr.2d 183, 832 P.2d 899]; see *Armendariz, supra,* 24 Cal.4th at pp. 106–107.) "[A]lthough judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the [hate crimes laws]." (*Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 232 [96 L.Ed.2d 185, 107 S.Ct. 2332, 2340].) "We recognize that there may be some limited and exceptional circumstances justifying judicial review of an arbitrator's decision when . . . granting finality to [the] decision would be inconsistent with the protection of a party's statutory rights." (*Moncharsh v. Heily & Blase,* at p. 32.)

In their reply brief, plaintiffs addressed whether arbitral expenses and attorney fees could be allocated between the hate crimes claim—to which *Armendariz* applied—and the common law claims—to which it did not— while the hate crimes claim was part of the case. (Cf. *Carver v. Chevron U.S.A., Inc., supra,* 119 Cal.App.4th at pp. 502–506; *Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 232 [51 Cal.Rptr.3d 527].) A related question is whether *Armendariz* and the statutory one-way attorney fees provisions applied at all after the hate crimes claim was dismissed, leaving only the common law claims. Because the allocation issues were not raised until plaintiffs' reply brief, they are not properly before us: Plaintiffs have not shown good cause for the belated argument, and the School has not had an opportunity to brief the subject. (See *Bains v. Moores* (2009) 172 Cal.App.4th 445, 459, fn. 18 [91 Cal.Rptr.3d 309]; *Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307, 318, fn. 4 [59 Cal.Rptr.3d 770].)

Accordingly, we shall reverse the judgment and remand the case so the trial court may take the necessary steps to ensure that the arbitration award does not include (1) any expenses unique to arbitration (see *Armendariz, supra,* 24 Cal.4th at pp. 107–113) or (2) any attorney fees prohibited by the Ralph Civil Rights Act or the Tom Bane Civil Rights Act. Further, on remand, either side may raise allocation issues, which shall be decided below in the first instance.

Finally, the School has raised the question of whether plaintiffs waived their *Armendariz* argument by not presenting it *to the arbitrator.* Because we lack the entire record of the arbitration proceedings, we cannot resolve the waiver issue. (See pt. IC, *ante.*) But the *Armendariz* argument *was* raised before *the trial court* in plaintiffs' petition to vacate the arbitration award.

And on appeal the parties have fully briefed whether *Armendariz*'s categorical rule should apply to plaintiffs' hate crimes claim. We may therefore decide the issue even if it was not raised in earlier proceedings. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 712–714 [58 Cal.Rptr.3d 102]; *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227–1228 [30 Cal.Rptr.2d 893]; see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶¶ 8:237 to 8:240.1, 8:243, pp. 8-157 to 8-161 (rev. # 1, 2008).)

## C. *Unconscionability of the Arbitration and Attorney Fees Provisions*

■ For the first time on appeal, plaintiffs contend that the arbitration and attorney fees provisions in the Enrollment Contract are unconscionable. We have the discretion to hear a newly raised question of law that can be decided on undisputed facts appearing in the record. (See *In re V.F.* (2007) 157 Cal.App.4th 962, 968 [69 Cal.Rptr.3d 159]; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 948, fn. 14 [43 Cal.Rptr.3d 468].)

■ " '[U]nconscionability has both a *procedural*" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to *unequal bargaining power*, the latter on ' "overly harsh" ' or ' "one-sided" ' results . . . . 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' . . . But they need not be present in the same degree . . . . [T]he more substantively oppressive the contract term, the less *evidence* of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra*, 24 Cal.4th at p. 114, citations omitted, third italics in original.)

Plaintiffs offered no evidence concerning an "inequality of bargaining power, lack of negotiation, or lack of meaningful choice based on those circumstances." (*Crippen v. Central Valley RV Outlet* (2004) 124 Cal.App.4th 1159, 1165 [22 Cal.Rptr.3d 189].) We cannot say, in the context of an enrollment contract with a private school, that, as a matter of law, a student's parents are unable to convince the school to remove a provision they dislike. (See *id.* at pp. 1162, 1164–1166 [outside employment context, party

arguing that arbitration agreement is unconscionable must produce evidence of parties' bargaining power and circumstances surrounding execution of agreement].)

Because the record discloses no procedural unconscionability to any degree, plaintiffs' unconscionability argument fails.

## III

## DISPOSITION

The judgment is reversed. On remand, the trial court shall take the necessary steps to ensure that plaintiffs do not pay any inappropriate arbitral expenses (see *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 107–113 [99 Cal.Rptr.2d 745, 6 P.3d 669]) or any attorney fees prohibited by the hate crimes laws (Civ. Code, §§ 52, subd. (b)(3), 52.1, subd. (h)). Plaintiffs are entitled to costs on appeal.

Miller, J.,* concurred.

**ROTHSCHILD, J.,** Dissenting.—The majority concludes that under *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*), plaintiffs cannot be required to bear any type of expense in arbitration that would not have been imposed if their hate crimes claim had been heard in a court. Nothing in the record before us, however, indicates that plaintiffs properly preserved that issue by raising it before the arbitrator. I would therefore affirm on that basis, without reaching the merits.

"Failure to raise [a claim of illegality] before the arbitrator . . . waives the claim for any future judicial review." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 31 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*).) As the Supreme Court has explained, any other rule would be "inconsistent with the basic purpose of private arbitration, which is to finally decide a dispute between the parties. Moreover, we cannot permit a party to sit on his rights, content in the knowledge that should he suffer an adverse decision, he could then raise the illegality issue in a motion to vacate the arbitrator's award. A contrary rule would condone a level of 'procedural gamesmanship' that we have condemned as 'undermining the advantages of arbitration.' [Citations.] Such a waste of arbitral and judicial time and resources should not be permitted." (*Id.* at p. 30.)

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Application of the *Moncharsh* waiver rule here is not inequitable. Plaintiffs' *Armendariz* argument is based entirely on their hate crimes claim. That claim was so patently meritless that the arbitrator rejected it at the pleading stage on the basis of a straightforwardly applicable federal statutory immunity. Plaintiffs should not be permitted to prolong these proceedings by using their frivolous hate crimes claim as a means to avoid liability for attorney fees and costs, even in part.

For the foregoing reasons, I respectfully dissent.